**Russell L. CURTIS, Jr., Plaintiff,**

v.

**The UNIVERSITY OF HOUSTON, et al., Defendants.**

**Civil Action No. H–95–5154.**

United States District Court, S.D. Texas, Houston Division.

Oct. 16, 1996.

Beatrice Mladenka–Fowler, Houston, TX, for Plaintiff.

Kathlyn Claire Wilson, Assistant Attorney General, Austin, TX, for Defendants.

Opinion on Summary Judgment

HUGHES, District Judge.

## 1. Introduction.

Russell Curtis is a sociology professor at the University of Houston. He complained frequently about school policies. When he applied for a full professorship, it was denied. Curtis sued because he says the university retaliated against him for his speech and it reviewed his rejection with irregular procedures.

Although Curtis's speech is protected, the school had sufficient, neutral, pedagogical justifications for denying his promotion. The lack of rigorous adherence to university procedures during the promotion review process frustrated Curtis but protected his interest sufficiently to be constitutionally adequate. Curtis loses.

## 2. Background.

This is a case about an unhappy professor. Before coming to Houston, Professor Curtis taught at the University of Texas. Curtis joined the faculty of the University of Houston in 1974 as an associate professor in the Sociology Department and has worked there ever since. He was awarded tenure in 1976 as an associate professor. Like other tenured professors, Curtis could earn promotion to full professor at the department's discretion. Around 1986, Curtis suffered from depression, marital problems, and alcoholism. He continued to teach, counsel students, research, and write, but not to the extent he had done before.

Since 1974, the department has had cliques who refer to themselves as "the Class of '42" and the "Coalition for Excellence." These groups include defendants Dworkin, Chafetz, Rodgers, and Ebaugh, all of whom have been Curtis's colleagues and, at one point or another throughout his time at the university, his boss as department chair or dean of the college. Curtis has consistently refused to align himself with these groups.

In May of 1993, Curtis applied for full professorship. He was denied promotion on the stated grounds that he (a) lacked the national visibility required to achieve the status of full professor; (b) had not published a

treatise in his field; and (c) had a long interruption from producing academic materials. After a review by the department and college, direct appeals to the university's promotion and tenure committee, and a grievance process through the college and university, the university persisted in denying Curtis his promotion.

Throughout his time at the university, Curtis vociferously spoke against the insular power structure in his department and other policies. He says that his speech resulted in the departmental authorities' retaliating by denying him promotion to full professor and its accompanying salary increase.

### 3. Free Speech.

 Under the Constitution of the United States the numerous governments may not restrict expression. The Constitution speaks in absolute terms: "Congress shall make *no* law ... abridging the freedom of speech." U.S. CONST. amend. I; TEX. CONST. art I, § 8. Curtis has the right to speak; although he has no right to public employment itself, he has a right to not be mistreated because of his speaking. The Constitution does not limit the speech that it frees to the polite, meaningful, or serious. The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). Simply, a state may not condition public employment on an employee's expression. *See, e.g., Keyishian v. Board of Regents of Univ. of State of New York,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (protected for refusing to take an oath on political affiliation); *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (protected for public and private criticism of employers); *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (protected for expressing hostility to public figures).

### 4. Public Workers & Principle.

It is beyond question that "a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment." *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 234, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977) (citing *Elrod v. Burns,* 427 U.S. 347, 357–60, 96 S.Ct. 2673, 2681–83, 49 L.Ed.2d 547 (1976)). As Justice Holmes said, however, while a policeman "may have a constitutional right to talk politics ... he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517 (1892) (a rule prohibiting members of a police force from soliciting money for political purposes and becoming members of a political committee held constitutional or statutory objection, and was reasonable).

 Even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong: for example, as in this case, where the government produces rational, independent reasons for their actions. Government employees' First Amendment rights depend on the "balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. of Township High School Dist. 205, Will County,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968).

Judges are fond of "balancing" tests, not because of their analytic rigor, but because they are comfortable with the old-fashioned weighing evaluations that judges routinely make. The Constitution is not routine. When the subject is speech, the only permissible balancing was done in 1791 when the Constitution was amended expressly to prohibit the government from using regulation of speech as a means to achieve its otherwise legitimate ends. The first congress and three-quarters of the states struck the only balance: that speech would be free.

 Because the plain text has no limit based on the speaker's character as an interested party in an employment relation, we must know that the constitutional principle applies to public workers. In the complexities and abstractions of modern life, which

some say render the whole constitutional enterprise inapplicable, the application of the right to free expression to government workers requires careful recurrence to first principles. With government employing 14% of the labor force and consuming 45% of the national product, the potential for bureaucratic repression is enormous as is the potential for workers' misuse of their positions for their own ends. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES 299, 328, 333, 416, 456 (1995); THE WORLD ALMANAC 146–58 (1996). The inherent conflict can be reconciled without balancing.

## 5. *Public Concern.*

■ Under the American system of limited government, it is the people who get to decide what speech is of "public concern." No less than college presidents, judges have no constitutional role in making qualitative distinctions about speech; we do not allow freedom to those whom we decide are talking about matters of public concern. The spectacle of a governmental officer's deciding that one question out of fourteen circulated among public workers was of public interest and the others were of personal interest— even if that officer is a justice of the Supreme Court—contradicts the function of the right to expression. Purely personal expressions may interest the public if we just let the public hear. The Constitution confides the *power* to decide what is in the public interest to the public. *Cf. Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

## 6. *A Jeffersonian Test.*

■ When a public employee contends that he was punished on the job for his speech, he must establish that the decision was motivated by his speech. When that is done, the employing government has the opportunity to show that it would have taken the adverse action—in the absence of the speech—on the basis of a legitimate governmental interest directly related to this employee's position. *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Occasionally the right to expression collides with an objective function of government that makes it necessary to reconcile the physical impossibility of both things co-existing. A public highway can physically accommodate rush-hour traffic or a parade, but not both simultaneously, and some reconciliation must be made. These are examples of occasions where the context of a public employee's speech makes her speech unprotected.

## A. *The Identity Problem.*

■ Occasionally a public worker is identified with the government for which she works while she is on the job. When a worker represents the government to the public, her casual comments may be understood as being official. In that case, it may be permissible for the government to require her not to talk about things not connected with her public function while exercising her public function. To a large extent, the identity problem is a performance problem. She is not being paid or put in contact with the public for the purpose of speeches about international monetary exchanges or her sister's health problems, rather to perform her public function.

A county employee in the recesses of a county building remarked to her boyfriend that she hoped that they got President Reagan the next time they shot him; she could not be fired because her distasteful remark was incapable of being heard by the public much less misidentified as representing the government. Had she been at a public service counter where her talk could have been understood to have represented the county, she could have been constitutionally disciplined. *See Rankin,* 483 U.S. at 378, 107 S.Ct. at 2893–94.

The public could not be fraudulently misled into thinking that the city was endorsing a political candidate because his paid advertising would have appeared in city buses any more than they think the other advertisements for deodorants or cigarettes show the city endorsed the product. *Contra Lehman v. City of Shaker Heights,* 418 U.S. 298, 303–04, 94 S.Ct. 2714, 2717–18, 41 L.Ed.2d 770 (1974). Similarly, a public employer should not dictate the sexual conduct and family living

arrangements of its employees without a clear showing that these private choices have a direct relation to job performance. *Contra Hollenbaugh v. Carnegie Free Library*, 439 U.S. 1052, 99 S.Ct. .734, 58 L.Ed.2d 713 (1978) (mem.).

### B. *The Policy Problem.*

■ Because talk and politics are inseparable, the Constitution allows policy positions rather than worker positions to be based on political talk. To conclude that policy positions could not be reassigned based on politics would eviscerate political accountability which is the essence of democracy as a technique of limiting government.

Assistant prosecutors can be discharged for their adherence to the policies rejected by the voters or other appointing authority because prosecutorial discretion is a quintessential policy decision. On the other hand, assistant public defenders are not part of a policy other than representation of their individual clients. Prosecutors represent an office, while defenders represent a person. In colleges, the distinction between policy and performance is reflected in the custom of granting tenure for academic positions and not for administrative positions. *See Elrod*, 427 U.S. at 347, 96 S.Ct. at 2676–77; *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (deciding that the First Amendment forbids government officials to discharge public employees solely for not being supporters of the party in power, unless party affiliation is an indicia of policy alignments appropriate for the position involved).

### C. *The Performance Problem.*

■ Public workers cannot convert their share of the public trust into a private asset for their own personal or political interests. Public workers have a direct responsibility for doing the job confided to them. A mathematics teacher who spends classroom time talking about Marxian economics can be fired, not for being a communist, but for not doing his job. Marx and baseball are equally and objectively incompatible with the nearly physical requirement that mathematics be taught. Similarly, a sanitation worker who was fired along with everyone else in the department when it was privatized would fail in a claim that his discharge was because of his opposition to the mayor at the last election.

### 7. *Professors & Performance.*

Performance is hard to quantify in professors. Professors are professional talkers and writers. These days they have other responsibilities in administration and their fields at large. These tasks may require skills not necessarily associated with teaching and research, like collegiality and paperwork. As there are international politics, there are faculty politics. Faculty politics can range from parking place assignments through fiscal integrity of departmental funds to the proper role of the discipline.

The tenure-granting process, a procedure nearly identical to promotion to full professor, is "intrinsically subjective" and is "a determination not readily scrutinized in the adversarial judicial forum." *Spuler v. Pickar*, 958 F.2d 103, 107 (5th Cir.1992). To the extent a decision about a professor's academic performance requires "an expert evaluation of cumulative information," it lends itself poorly to judicial scrutiny and evaluation. *Levi v. University of Texas at San Antonio*, 840 F.2d 277, 280 (5th Cir.1988) (quoting *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 89–90, 98 S.Ct. 948, 954–55, 55 L.Ed.2d 124 (1978)). The inherently subjective nature of a university department's choice to promote a professor is nearly unmeasurable. In considering a decision to grant that ultimate achievement to a professor, the committee *must* take into account not only his quantifiable productivity but also his unquantifiable personality, collegiality, and future or projected performance, among myriad other factors about which the court can only speculate. Without indicia of retaliation, a court's questioning of Curtis's process amounts to conjecture.

### 8. *Curtis's Speech.*

Curtis claims that these incidents comprise his speech that provoked retaliation:

A. He opposed the hiring of Rosalind Dworkin, Gary Dworkin's wife, by speaking against nepotism and suggesting that, at the least, she should not be hired without a national search. She was hired.

B. He opposed the tenure of Mark Matre in 1974 and recanted that opposition.

C. In 1976, he opposed Chafetz when as chair of the department he attempted to take away the office of a retired professor. Curtis spoke out against this "ageism."

D. In 1975, he opposed Chafetz's attack on his colleague Sol Tannenbaum who had objected to the tenure of Sheila Sheinburg.

E. He opposed the termination of James Kelsaw in 1976.

F. He opposed the tenure of Rosalind Dworkin in 1980 because of the underlying nepotism and her lack of publication. She was denied tenure.

G. He opposed the appointment of Rodgers as dean in 1985.

H. He opposed the tenure of Jon Lorance one year before his tenure review should have occurred as an exception to policy. Lorance had published eighteen articles and one research monograph during his associate professorship, five of which appeared in the top three journals, and four more in the top specialty journal in Lorance's area—more articles in high prestige journals than the rest of the sociology faculty put together.

I. He opposed Ebaugh's, then chair of the department, decision not to hire Charles Bullard, a black professor, without consulting the department. Curtis complained of this perceived racism in a 1988 *Houston Cougar* article entitled "*Racism in Sociology?*" and the action taken by Ebaugh and the department. Once these events were public, Dean Rodgers asked Ebaugh to resign as department chair, with Curtis's full support. To replace Ebaugh, Rodgers appointed Gary Dworkin as department head, even though up to then the chair had always been elected by the faculty.

J. He publicly objected to the university's falsification of graduate student hours to obtain state funds.

9. *Implications.*

▇ Although it does not constitutionally matter, Curtis's speech was clearly on matters of public concern; he spoke on arbitrariness and accountability in a large public university, including racism and nepotism. Speech on the treatment of a retired professor by junior faculty, hiring a professor's wife, and a colleague's misrepresentations on the hiring of a black professor are all aspects of the administration of the university that affect the public. Even though Curtis spoke in his role as a co-worker about things affecting him, his criticism invokes the Constitution.

▇ Curtis suffered an adverse action on the job, and he had spoken in ways and about subjects that a reasonable person would apprehend as generating a high risk of hostility. The difficulty is that Curtis cannot establish that this hostility motivated the decision not to promote him. The sequence of speech then punishment does not logically imply the causal connection required by the law; it is necessary but not sufficient, as they say in academia.

Because the causal connection will commonly be difficult to prove, courts have developed the sensible approach of requiring a defendant to explain himself once the plaintiff has established the necessary predicate. The irrationality of a justification offered by the defendant allows the inference that the true motivation was illegal, which for governments includes mere irrationality itself. Judges are not particularly adept at faculty appointments or instant psychology of decisions, but they are skillful detectors of *post hoc* rubbish. *See Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576.

Curtis contends that the motivation for the decision not to promote him is shown by the correlation between support for the power clique of Dworkin, Ebaugh, and Chafetz and promotions. He says the evidence shows

that the only faculty members to vote against his promotion were the members of the "Coalition for Excellence." They opposed him despite positive letters from outside reviewers; all five outside reviewers recommended that Curtis be promoted.

Correlation is not causation. No statistical inference can be drawn from a sample as small as the sociology department. The issue is:

> Whether the reasons given by the sociology department were actually based on Curtis's performance; or whether the decision was based in an articulable, legitimate requirement of the institution supported by some evidence of reasonable correspondence with objective reality.

The inherent evaluative, imprecise, uncertain, and judgmental nature of the decision to award a full professorship requires that, although the process must have a factual basis, it need not have mathematical quantification.

10. *Full Professor.*

■ The defendants reported that their decision not to promote Curtis to full professor was based on "his lack of a published research monograph, his lack of national visibility, and his hiatus from a productive output of academic materials." Published in the department's "Tenure and Promotion Process and Criteria Policy," these are the standards for promotion to full professor:

A. The quality and quantity of the candidate's research, allowing for mixes of refereed-journal articles, books, book chapters, research reports, and monographs;

B. Some work published in premier sociological journals;

C. Participation in American Sociological Association meetings and other conferences;

D. Research grants and contracts;

E. Commitment to and competency in teaching;

F. Invited papers; and

G. Reprints of published work.

The manual says that the professor should be "a nationally recognized and respected expert.... Teaching, campus and community service are of minimal importance in assessing a candidate. Professional service is more important." [Yes. It actually says that *teaching* is of "minimal importance" in a public university's decision to promote professors.]

Curtis's own affidavits allow a comparison of his level of academic achievement to the department aspirations in selecting full professors:

- William Simon, one of the two professors in the sociology department who supported Curtis's promotion, has published two books, edited two others, and written over thirty articles, but he has not published a monograph.

- Jon Lorance, to whom the department decided to give early tenure, distinguished himself by publishing eighteen articles and one research monograph during his associate professorship, five of which appeared in the top three journals in the discipline, and four more in the top specialty journal in Lorance's area—more articles in high prestige journals than the rest of the sociology faculty put together.

Curtis, on the other hand, has published no research monograph, served on no national committees, contributed no chapter to books, participated in no national or international conference. He published only five articles since 1988—which is compounded by Curtis's having produced no academic work for the ten years before 1988.

Currently, Curtis has made significant improvements from the department's perspective. He has contracted to write a textbook, begun a research monograph, and started to participate in national organizations. At every level of his original review, appeals, and grievances, the university observed that despite some lost time Curtis was on his way to returning to the type of scholarly career expected for promotion to full professor. One memorandum from Rodgers to Glenn Aumann, acting senior vice president of the university, said: "Curtis has restarted a once promising scholarly career that seemed to be placed on hold for many years."

A university may base its decisions to promote a professor on numerous, highly subjective criteria. Here, the department articulated rational, neutral justifications for nonpromotion independent of its assumed hostility to Curtis's speech. The factors of productivity—publishing, including article quality and journal prestige, professional activity, university service, teaching, and attendance—are all subjective, pedagogical decisions directly affecting the professional lives and institutional base of the sociology department. The committees can consider factors as individual and personal as how the professor will fit into the direction of the department and how his personality will mesh with his colleagues. As the university promotion and tenure committee noted, there is "no clear evidence that Professor Curtis has been held to a standard not required of others." Curtis has given no evidence that the denial of his promotion was for a reason other than those stated by the department, relying only on a muddled conspiracy theory. A cluster of professors can run a clique that dominates the operation of a university department without violating the constitution; informal alliances are assumed, but the court's job is examining their use.

### 11. *Procedural Irregularity.*

Curtis claims that the process the university used was irregular. If the university did not conduct itself through procedure reasonably adapted to prevent or correct errors in promotion decisions, the employee may have an independent claim because the Constitution requires that governmental agencies act with at least minimal rationality in the effort to eliminate the tyranny of arbitrariness. The procedure used also may implicate the truthfulness of the reasons given by the university for the action in the first place because decisions taken by an irregular process frequently have motivations that would have been revealed by a "due" process.

 The Constitution requires that the government use a process that reasonably affords an affected person an opportunity to know and meet objections and to detect errors. The rigor of the required process is proportionate to the interest affected by the government's act; as the severity of the impact on the individual increases the procedural safeguards must increase. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). As Justice Matthews said:

> Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances ... the denial of equal justice is still within the prohibition of the Constitution.

*Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886).

A professor who is eligible for promotion has a very narrow interest that is personal to him. He shares the public's interest in general governmental regularity, but in this case, he claims to have a personal interest. His interest is an equal opportunity with others to be considered for promotion on the basis of criteria demonstrably related to the performance of the job.

 Curtis claims that the college and university faculty handbooks gave him the future expectation of a property right in a position as a full professor. This argument is erroneous. Although Curtis has a property interest in his status as a tenured associate professor, he has no property right to the promotion. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (stating that a protected property interest in public employment is derived from the expectation of continued employment, not the expectation of future employment in the position of the plaintiff's choice); *Cannon v. Beckville Indep. School Dist.,* 709 F.2d 9, 10 (5th Cir.1983).

### 12. *Curtis's Procedural Paths.*

A. *"In case of a tie vote the motion shall be lost."*

Curtis began his original promotion process in May of 1993 by submitting an application for full professorship. Later that year, the sociology department voted

two-to-two on his promotion. The fifth professor, Zena Blau, originally abstained from the vote, claiming that she was too close to retirement to vote on the department's future. Blau later changed her mind and cast the tie-breaking vote against Curtis's promotion. Without her vote the promotion would have been denied because ties fail.

The application went to the department chair, who joined in the denial, and then it went to the dean of the College of Social Sciences, where the department chair's decision on Curtis was affirmed. Curtis appealed the college decision, and his application went to the university's promotion and tenure committee. The Committee voted against the promotion, and later the president of the university also denied it. *See generally* Texas Legislative Manual, Rules of the House of Representatives, Rule 11, § 12 (Merrill W. Tinkler ed. 1964) ("In case of a tie vote the motion shall be lost").

## B. *"The voice of the majority decides."*

Curtis then began the grievance process, filing first with the college and then with the university grievance committees, both of which affirmed the decision. The university grievance committee voted eight-to-zero to affirm the Committee. The grievance was then sent to the vice-president of the university and finally to the president, both of whom affirmed the decision of the university grievance committee.

The process used for Curtis was not perfect by the university's internal policy standards. Under university policy, when a negative recommendation on promotion is first reached, the faculty member involved "shall be informed immediately of that recommendation in writing by the faculty body." The department chair, Dworkin, failed to give Curtis written notice that he would not be promoted.

After receiving Curtis's notice that he would appeal, Dean Rodgers assigned Associate Dean Carp to write new procedures for the appellate process. Curtis's appeal was postponed by the Committee until Carp finished the new procedures. Curtis presented these procedural errors to the committee along with the other complaints about the promotion itself. It recommended against revising the promotion decision. The college and university grievance committees concluded that procedural violations had occurred, noting that the committee had behaved irregularly when they changed the appellate procedure during Curtis's appeal. The grievance committees concluded that the irregularities did not cause an error on the substance of the appeal.

The university committee specifically found that the sociology department had violated university policy in its failure to send Curtis the negative recommendation in writing, recognizing that this omission had an impact on Curtis's ability to appeal. The record reflects, though, that Dean Rodgers informed Curtis of his right to appeal in a memorandum on December 3, 1993, and Curtis filed his appeal letter with the college committee on December 8, 1993. It also found that it was improper for the college to issue new guidelines to the committee during an appeal. With these findings in mind, the university Committee voted eight-to-zero that there was "no evidence the College P & T Committee declined to consider the merits of this case or any of the substantive issues contained in the appeal materials provided by Professor Curtis." The committee went on to say: "Professor Curtis's appeal was extremely thorough and carefully prepared." The committee concluded,

> This Committee has not been provided with any clear or convincing evidence that the negative departmental recommendation was the result of a schism in the Sociology Department.... To the contrary, it is quite evident that there are real differences in the professional judgment(s) of senior faculty in the department regarding the relative weighting and merit of various activities that constitute scholarship that leads to national recognition.

*See generally* Jefferson's Parliamentary Writings 407 (Charles T. Cullen ed. 1988) ("The voice of the majority decides").

**1080**

### 13. Adequate Process.

 The imperfect process given Curtis is constitutionally adequate. Even when a university departs from its own regulations, it does not necessarily generate a constitutional claim because the constitutional standard is an absolute minimum. Governments are allowed to create more procedural safeguards than the minimum. *Levitt v. University of Texas at El Paso,* 759 F.2d 1224 (5th Cir.1985). At some point the accumulation of departures from what the individual reasonably expects through the institution's procedures may raise an inference of illegal motivation separate from the claim to fair process itself. *Franceski v. Plaquemines Parish School Board,* 772 F.2d 197, 200 (5th Cir. 1985); *see also Regents of University of Michigan v. Ewing,* 474 U.S. 214, 223–26, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) (stating that a federal court should respect the faculty's professional judgment and may override the decision only if it departs so substantially from accepted academic norms as to indicate the faculty did not actually exercise that judgment). *See Spenceley, et al. v. M.D. Anderson Cancer Center,* 938 F.Supp. 398 (S.D.Tex.1996) (Hughes, J.).

The court recognizes that no precise standard can be applied to reviewing the promotion in this case; the only possibility is that Curtis might be able to establish that the question of his promotion was not addressed independently from the other complication within the institution, implicating potentially the constitutional requirement of procedural regularity commensurate with the likely harm to him Here, the facts clearly show that the university has articulated clear and rational justifications for denying Curtis promotion and has met federal due process standards.

### 14. Disability.

 Curtis began his action with a claim that he had been discriminated against because he was disabled. His disability was excessive drinking; the actual period of impaired functioning was before 1988. The process of analysis under the federal statute that seeks to eliminate prejudice against people who are disabled is:

- Is there an objective basis for the handicap, like being unable to walk, see, hear, speak, breathe, lift, or learn? For Curtis, *no.*
- Does the combination of these inabilities limit his ability to work for a living as an abstraction? For Curtis, *no.*
- Is the function he cannot perform essential to the job? For Curtis, *no.*
- Is only a reasonable accommodation needed for the job? For Curtis, *no.*
- Is the explanation for the job action a transparent cover for "reactive distaste?" For Curtis, *no.*

To succeed, a claimant must generate yes answers to all five questions. *See* 42 U.S.C. §§ 12101–12213 (Americans with Disabilities Act); 29 U.S.C. §§ 629, 706 (The Rehabilitation Act).

Curtis says that he is not now disabled by drink but that his co-workers are treating him as if he were still an alcoholic. He says that this puts him in the category of people who have a problem that is perceived as disabling even though they are not prevented from functioning fully. He is disabled by his record. A history of nonperformance based on an historic drinking problem may be considered in employment decisions without offending the federal law. The act protects individuals from employers' expanding a partial disability into a total disability by a misstereotyping generalization.

### 15. Conclusion.

Associate Professor Curtis has been highly vocal in his objections to the way the sociology department at the University of Houston had been run during the nineteen years before he applied for promotion to full professor. He claims that the department majority and the department chair rejected his application in substantial part because of his opposition to them and their allies within the school. The school produced evidence of rational, job-related criteria used in the process and neutrally applied to everyone that Curtis could not meet. No evidence—not even Curtis's sheer "outspokenness"—was adumbrated to show the faculty's judgment to have been tainted.

Curtis received notice, opportunity to respond, and review by officers not directly involved in the original decision; that process was sufficient to protect his interest in equal access to opportunity for promotion.

Curtis will take nothing from the University Houston or the other defendants.