No. 78–5519. HOLLENBAUGH ET AL. *v.* CARNEGIE FREE LIBRARY ET AL. C. A. 3d Cir. Certiorari denied. MR. JUSTICE BRENNAN would grant certiorari.

MR. JUSTICE MARSHALL, dissenting.

The Court today lets stand a decision that upholds, after the most minimal scrutiny, an unwarranted governmental intrusion into the privacy of public employees. The ruling below permits a public employer to dictate the sexual conduct and family living arrangements of its employees, without a meaningful showing that these private choices have any relation to job performance. Because I believe this decision departs from our precedents and conflicts with the rulings of other courts, I would grant certiorari and set the case for argument.

## I

Petitioner Rebecca Hollenbaugh served as a librarian and petitioner Fred Philburn as a custodian at the state-maintained Carnegie Free Library in Connellsville, Pa. The two began seeing each other socially, although Mr. Philburn was married at the time. In 1972, Ms. Hollenbaugh learned that she was pregnant with Mr. Philburn's child, and within a month, Mr. Philburn left his wife and moved in with Ms. Hollenbaugh. Due to her pregnancy, Ms. Hollenbaugh sought and was granted a leave of absence by the respondent Board of Trustees from March to September 1973. While petitioners did not conceal their arrangement, neither did they advertise it.

Responding to some complaints from members of the community, the Board of Trustees attempted to dissuade petitioners from continuing to live together. When petitioners refused to alter their arrangement, they were discharged. They subsequently brought this action under 42 U. S. C. § 1983 seeking declaratory and injunctive relief and monetary damages.

After a nonjury trial, the District Court found that under the minimum rationality test, petitioners' discharge did not violate the Equal Protection Clause. The court further concluded that petitioners' behavior was not encompassed within the constitutional right to privacy. 436 F. Supp. 1328 (WD Pa. 1977). The Court of Appeals for the Third Circuit affirmed on the basis of the District Court's opinion. 578 F. 2d 1374 (1978).

## II

I have frequently reiterated my objections to the perpetuation of "the rigid two-tier model [that] still holds sway as the Court's articulated description of the equal protection test." *Massachusetts Board of Retirement v. Murgia,* 427 U. S. 307, 318 (1976) (MARSHALL, J., dissenting); see, *e. g., Marshall v. United States,* 414 U. S. 417, 432–433 (1974) (MARSHALL, J., dissenting); *San Antonio Independent School Dist. v. Rodri-*

*guez,* 411 U. S. 1, 98–110 (1973) (MARSHALL, J., dissenting). The test that this Court has in fact applied has often, I believe, been much more sophisticated. The substantiality of the interests we have required a State to demonstrate in support of a challenged classification has varied with the character of the classification and the importance of the individual interests at stake. See, *e. g., Trimble* v. *Gordon,* 430 U. S. 762, 767 (1977); *Craig* v. *Boren,* 429 U. S. 190 (1976); *Bullock* v. *Carter,* 405 U. S. 134, 144 (1972); *Reed* v. *Reed,* 404 U. S. 71 (1971); see also Gunther, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1 (1972). Had the courts below undertaken this inquiry, rather than unreflectively applying the minimum rationality test, the outcome here might well have been different.

Respondents do not claim to have relied on a legislative proscription of particular sexual conduct. The Commonwealth of Pennsylvania repealed its law prohibiting adultery and fornication in 1972. 1972 Pa. Laws, Act No. 334, § 5. Rather, in the exercise of ad hoc and, it seems, unreviewable discretion, respondents determined to deprive petitioners of their jobs unless "they 'normalized' their relationship through marriage or [unless] Philburn moved out." 436 F. Supp., at 1331. The District Court found that "the motivating factor behind the discharges of [petitioners] was that they were living together in a state of 'open adultery.'" *Id.,* at 1332. Respondents were unwilling to appear as if they "condoned [petitioners'] extramarital 'affair' and . . . the child's birth out of wedlock." *Ibid.* Thus, respondents apparently did not object to furtive adultery, but only to petitioners' refusal to hide their relationship. In essence, respondents sought to force a standard of hyprocrisy on their employees and fired those who declined to abide by it. In my view, this form of discrimination is particularly invidious.

Such administrative intermeddling with important personal

rights merits more than minimal scrutiny. One such right, clearly implicated by petitioners' discharge, is that " 'of the individual . . . to engage in any of the common occupations of life,' " *Board of Regents* v. *Roth,* 408 U. S. 564, 572 (1972), quoting *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923); see *Perry* v. *Sindermann,* 408 U. S. 593, 597 (1972); *Pickering* v. *Board of Education,* 391 U. S. 563, 568 (1968). Perhaps even more vital is "the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." *Stanley* v. *Georgia,* 394 U. S. 557, 564 (1969). Although we have never demarcated the precise boundaries of this right, we have held that it broadly encompasses "freedom of personal choice in matters of marriage and family life." *Cleveland Board of Education* v. *LeFleur,* 414 U. S. 632, 639–640 (1974) (pregnancy). See, *e. g., Loving* v. *Virginia,* 388 U. S. 1, 12 (1967), and *Zablocki* v. *Redhail,* 434 U. S. 374, 383–385 (1978) (marriage); *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541–542 (1942) (procreation); *Eisenstadt* v. *Baird,* 405 U. S. 438, 453–454 (1972); *id.,* at 460, 463–465 (WHITE, J., concurring in result), and *Carey* v. *Population Services International,* 431 U. S. 678, 684–685 (1977) (contraception); *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944) (family relationships); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925), and *Meyer* v. *Nebraska, supra,* at 399 (child rearing and education); *Roe* v. *Wade,* 410 U. S. 113, 152–153 (1973) (abortion); *Moore* v. *East Cleveland,* 431 U. S. 494, 499 (1977) (plurality opinion) (right to determine family living arrangements).

Petitioners' rights to pursue an open rather than a clandestine personal relationship and to rear their child together in this environment closely resemble the other aspects of personal privacy to which we have extended constitutional protection. That petitioners' arrangement was unconventional or socially disapproved does not negate the resemblance, cf. *Carey* v. *Population Services International, supra,* at

698, 699 (plurality opinion); *Eisenstadt* v. *Baird, supra,* at 452–453; *Wisconsin* v. *Yoder,* 406 U. S. 205, 223–224 (1972), particularly in the absence of a judgment that the arrangement so offends social norms as to evoke criminal sanctions. And certainly, no distinction can be drawn between this case and those cited above in terms of the importance to petitioners of this personal decision. In addition, to impose separate living arrangements as a condition of employment impinges not only on petitioners' associational interests, but also on the interests of their child in having a two-parent home. See *Trimble* v. *Gordon, supra,* at 769–770; *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164, 175 (1972).

Petitioners' choice of living arrangements for themselves and their child is thus sufficiently close to the interests we have previously recognized as fundamental and sufficiently related to the constitutional guarantee of freedom of association that it should not be relegated to the minimum rationality tier of equal protection analysis, a disposition that seems invariably fatal to the assertion of a constitutional right. See *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S., at 319–320 (MARSHALL, J., dissenting). Rather, respondents should at least be required to show that petitioners' discharge serves a substantial state interest. See *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S., at 124–126 (MARSHALL, J., dissenting); *Massachusetts Board of Retirement* v. *Murgia, supra,* at 325 (MARSHALL, J., dissenting); *Reed* v. *Reed, supra,* at 76–77. As the plurality held in *Moore* v. *East Cleveland, supra,* at 499, "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation."

Moreover, respondents' actions here may not withstand even the minimal scrutiny of the rational-basis test. In the District Court's view, the test was satisfied because respondents

could have legitimately concluded that petitioners' relationship impaired their effectiveness on the job and that failure to discharge them would constitute tacit approval of an illicit relationship.

The court acknowledged, however, that petitioners were "competent employees who had had no significant problems with their employers until the circumstances that gave rise to their discharges." 436 F. Supp., at 1330–1331. In suggesting that respondents could rationally find petitioner Hollenbaugh unfit to perform her duties, the court observed merely that her job "involved direct and frequent contacts with the community" and that the "community was well aware of [petitioners'] living arrangement." *Id.*, at 1332, 1333. This reasoning reduces to the conclusion that Hollenbaugh was incompetent as a librarian because some members of the community disapproved of her lifestyle. But the District Court never intimated that this disapproval affected the community members' use of the library or that Hollenbaugh's marital status in any way diminished her ability to discharge her duties as a librarian. And the court gave no indication that Philburn's custodial job called for similar contacts with the community or that his performance was affected in any way by his extramarital relationship.

Nor does the District Court's opinion make clear how respondents' interest in avoiding the appearance of "tacit approval" of petitioners' relationship provided a rational basis for petitioners' discharge. The court adverted to no evidence suggesting that petitioners' status impaired the library's performance of its public function. Moreover, the State has given some indication of the prevailing moral sensibilities of the community by the repeal in 1972 of the criminal sanctions against fornication and adultery.

## III

On a record so devoid of evidence in support of petitioners' discharge, the Court of Appeals' holding appears to conflict

with decisions of other courts striking down similar attempts by governmental bodies to regulate the private lives of their employees. In *Andrews* v. *Drew Municipal Separate School Dist.*, 507 F. 2d 611 (CA5 1975), cert. dismissed as improvidently granted, 425 U. S. 559 (1976), the Court of Appeals found that a school district rule barring employment of unwed parents was insufficiently related to any legitimate objective to satisfy the requirements of the Equal Protection Clause. Similarly, in *Drake* v. *Covington County Board of Education*, 371 F. Supp. 974, 979 (MD Ala. 1974), a three-judge District Court declared unconstitutional the dismissal of an unmarried, pregnant teacher, finding no compelling interest "which would justify the invasion of [the teacher's] constitutional right of privacy." See also *Mindel* v. *United States Civil Service Commission*, 312 F. Supp. 485 (ND Cal. 1970) (discharge of postal clerk for living with a woman not his wife held unconstitutional). These decisions reflect a considerably greater degree of solicitude for the privacy interests of public employees than was evident in the rulings of the courts below.

I believe that individuals' choices concerning their private lives deserve more than token protection from this Court, regardless of whether we approve of those choices. Accordingly, I dissent from the denial of certiorari.