# STATE OF CONNECTICUT *v.* JOHN M.[1]
## (AC 25313)

Lavery, C. J., and Schaller and Harper, Js.[*]

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[*] The listing of judges reflects their status on this court as of the date of oral argument.

Argued October 20, 2005—officially released April 11, 2006

*Martin Zeldis*, public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Stacey M. Haupt*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. General Statutes § 53a-72a (a) (2) criminalizes sexual intercourse between kindred persons. The jury found the defendant guilty under that statute and judgment of conviction was rendered, from which he now appeals. We reverse the judgment of the trial court.

The relevant facts are undisputed. On April 22, 2002, the victim was seventeen years old and lived with J and the defendant. The victim, a junior in high school, stayed

home from school that day due to sickness. The only other person home that morning was the defendant. While watching a movie together in the defendant's bedroom, the defendant engaged in oral sex and vaginal intercourse with the victim.[2]

On August 7, 2002, the defendant was arrested and charged with one count of sexual assault in the second degree in violation of General Statutes § 53a-71. By long form information dated November 12, 2003, the defendant was accused of sexual assault in the third degree in violation of § 53a-72a (a) (2). The defendant pleaded not guilty to both charges and a trial ensued. At the conclusion of the evidentiary phase of the trial, the defendant moved for a judgment of acquittal on both charges. The court granted the motion in part, and the defendant was acquitted of sexual assault in the second degree. Trial proceeded on the charge of sexual assault in the third degree, of which the jury found the defendant guilty. The court thereafter sentenced the defendant to five years imprisonment, execution suspended after three years, with ten years probation pursuant to special conditions that included registration as a sex offender. This appeal followed.

I

The defendant first alleges that the evidence was insufficient to establish, beyond a reasonable doubt, that he was the stepfather of the victim. It is axiomatic that the jury must find every element proven beyond a reasonable doubt in order to find a defendant guilty of the charged offense. See, e.g., *State* v. *Ledbetter*, 275 Conn. 534, 542, 881 A.2d 290 (2005). Our review of evidential insufficiency claims employs a two part test. "First, we construe the evidence in the light most favor-

___

[2] It is undisputed that the acts occurred between consenting adults, as the defendant was acquitted of sexual assault in the second degree in violation of General Statutes § 53a-71.

able to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Boscarino*, 86 Conn. App. 447, 454, 861 A.2d 579 (2004).

"While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense[s], each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . [I]n determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . [A]n inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. . . . Moreover, [i]n evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . Finally, we must remember that it is the jurors who are the arbiters of fact. [W]e do not sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict of guilt beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Glasper*, 81 Conn. App. 367, 371–72, 840 A.2d 48, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004).

To establish guilt of sexual assault in the third degree, the state was required to prove that the defendant was the stepfather of the victim. See General Statutes § 53a-

72a (a) (2).[3] To do so, it necessarily was required to provide a sufficient evidentiary basis from which the jury could conclude that (1) the defendant was married to J and (2) J was the victim's mother. We address each in turn.

A

The defendant first claims that there was insufficient evidence in the record of his husband-wife relationship with J. We disagree.

The following evidence was before the jury. After the sexual assault was reported to the police, the defendant provided an oral statement at the police department concerning the events of April 22, 2002. The statement was recorded, and the defendant signed a voluntary interview form.[4] In that statement, the defendant identified the victim as "my wife's daughter" and identified his wife as J. He further stated that they were legally married fourteen years ago. At trial, the victim testified that the defendant was married to J and identified the defendant as her stepfather, but conceded on cross-examination that she lacked any firsthand knowledge as to whether they were actually married. L, an alleged sister of the victim, testified that she had witnessed a marriage ceremony between the defendant and J in Texas. She stated that "they got married in the church, but it wasn't a wedding type setting."

[3] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person . . . (2) engages in sexual intercourse with another person whom the actor knows to be related to him or her within any of the degrees of kindred specified in [General Statutes §] 46b-21."

[4] Dated May 24, 2002, and signed by the defendant, the voluntary interview form asked, inter alia, whether "we have told you that you can terminate this interview and leave at any time. You fully understand what we have told you and we will not stop you if you decide to leave. Do you understand this and you are voluntarily submitting to this interview?" It also stated: "No promises or threats have been made to get you to agree to this interview. Is that correct?" To both of these queries, the defendant wrote "yes."

Relying primarily on our Supreme Court's decision in *State* v. *Roswell,* 6 Conn. 446 (1827), the defendant insists that his admission was insufficient to establish the fact that he was married to J. Our analysis begins, therefore, with an examination of the *Roswell* decision.

In *Roswell,* the defendant was charged with and convicted of the crime of incest with his daughter. Prior to trial, the defendant confessed that the victim was his daughter and that he was married to the victim's mother. Our Supreme Court held that the admission of the defendant's statement was improper: "[T]his testimony was from its nature inadmissible, because if accompanied with proof of a marriage in fact, unnecessary, and if not so accompanied, as was the case here, then wholly insufficient: and that, therefore, a new trial should be granted."[5] Id., 451. The court noted that "a

---

[5] The state maintains that *Roswell* "has effectively been overruled sub silentio by our rules of evidence." Connecticut Code of Evidence § 8-3 (1) (A) provides that a statement that is being offered against a party and is the party's own statement is admissible as an exception to the hearsay rule. See also *State* v. *Ferguson,* 260 Conn. 339, 357–58, 796 A.2d 1118 (2002) ("It is an elementary rule of evidence that an admission of a party may be entered into evidence as an exception to the hearsay rule. . . . [S]tatements made out of court by a party-opponent are universally deemed admissible when offered against him . . . so long as they are relevant and material to issues in the case. . . . [T]he vast weight of authority, judicial, legislative, and scholarly, supports the admissibility without restriction of *any* statement of a party offered against that party at trial." [Citations omitted; emphasis added; internal quotation marks omitted.]); *State* v. *Woodson,* 227 Conn. 1, 15, 629 A.2d 386 (1993); accord 4 C. Fishman, Jones on Evidence (7th Ed. 2000) § 27:3, p. 447 (in criminal trials state may offer declarant-defendant's own statement against him as admission); 2 C. McCormick, Evidence (5th Ed. 1999) § 254, p. 137 (admissions of a party are received as substantive evidence of the facts admitted); 4 Wigmore, Evidence (Chadbourn Rev. 1972) § 1048, p. 2 (statements made out of court by a party-opponent are universally deemed admissible when offered against him); C. Tait, Connecticut Evidence (3d Ed. 2001) § 8.16.5, pp. 593–94 (rule regarding admission of party's own statement "neatly summed up with the phrase 'everything you can say can be used against you' "). The proposition espoused by those authorities essentially was the view of the dissent in *Roswell.* See *State* v. *Roswell,* supra, 6 Conn. 453 (*Peters, J.,* dissenting). While we acknowledge the seemingly contradictory nature of *Roswell* and § 8-3, we know of no

man or woman may verily suppose a marriage to have been consummated, when no lawful marriage ever took place. Ignorance of the law on this subject may be presumed, in many cases, and confessions of a marriage made, without a knowledge of the requisites to constitute it such." Id. *Roswell*, thus, represents the proposition that, in incest cases, the defendant's admission alone is insufficient to establish either a husband-wife or parent-child relationship.

The present case is distinguishable from *Roswell*. In *Roswell*, there was no "testimony of a witness who was present at [the marriage] celebration . . . ." Id., 449. Here the jury reasonably could credit the testimony of L that a marriage ceremony had occurred in a church in Texas. That testimony is consistent with the defendant's admission. We conclude that the cumulative effect of the evidence, including reasonable inferences drawn therefrom, viewed in the light most favorable to sustaining the verdict, was sufficient to justify the jury's conclusion that the defendant and J were married.

### B

We next consider whether there was sufficient evidence in the record of a mother-daughter relationship between J and the victim. The defendant again refers to *Roswell* in support of his claim.

Besides the defendant's admission, the only evidence presented to the jury concerning the mother-daughter relationship was the testimony of the victim. She testified that she was born in the Virgin Islands in 1984. From approximately three weeks of age until after the age of sixteen, the victim was raised there by C and A, whom she considered to be her aunt and uncle. In that period, she twice visited J. In 2001, the victim moved

authority indicating that a decision of the Connecticut Supreme Court may be overruled by the promulgation of rules of evidence. Rather, the overruling of *Roswell* remains exclusively the province of that court.

to Connecticut to live with J and the defendant. Most importantly, the victim identified J as her mother.

The jury, thus, was presented with declarations by both the victim and the defendant that J was her mother. It is therefore not surprising that the jury, in the face of such uncontested unanimity, found the testimony persuasive. It remains insufficient nonetheless.

The *Roswell* court noted the "special" nature of allegations regarding parentage and stated that "such an allegation must be proved, or the prisoner must be acquitted." Id., 450. Just as a person may suppose and confess to a marriage that in actuality is invalid, so, too, may a person suppose and confess to equally invalid parentage. The respective assertions of the defendant and the victim, although in agreement, remain mere allegation. *Roswell* requires more. Yet, no documentation, such as a birth certificate, was introduced at trial.[6] In addition, J never testified, nor did anyone that possessed firsthand knowledge of the victim's parentage. Without such evidence, the testimony presented to establish a mother-daughter relationship between J and the victim runs afoul of our Supreme Court's mandate in *Roswell* and, thus, is insufficient. Accordingly, we reverse the judgment of conviction of sexual assault in the third degree.

## II

Even were we not constrained by the *Roswell* precedent, the defendant's conviction remains untenable. Independent of his claim of evidential insufficiency, the defendant alleges that § 53a-72a (a) (2) violates his right to equal protection under the law.[7] The equal protection

---

[6] Hospital records and birth certificates normally make a further acknowledgment and formal proof of parentage unnecessary. See *Miller* v. *Albright*, 523 U.S. 420, 444, 118 S. Ct. 1428, 140 L. Ed. 2d 575 (1998).

[7] We are mindful that "[e]stablished wisdom counsels us to exercise self-restraint so as to eschew unnecessary determinations of constitutional questions." (Internal quotation marks omitted.) *State* v. *Campbell*, 224 Conn. 168, 175, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365,

clause of the fourteenth amendment to the United States constitution demands that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." It is "essentially a direction that all persons situated similarly should be treated alike." *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). The defendant failed to preserve his claim and now requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8] We review the claim under *Golding* because it is of constitutional magnitude and the record is adequate for review.

The defendant's appeal centers on two related statutes, General Statutes §§ 53a-72a (a) (2) and 46b-21. Section 53a-72a (a) provides in relevant part that "[a] person is guilty of sexual assault in the third degree when such person . . . (2) engages in sexual intercourse with another person whom the actor knows to be related to him or her within any of the degrees of kindred specified in section 46b-21." Section § 46b-21

124 L. Ed. 2d 271 (1993); see also *State* v. *Waz*, 240 Conn. 365, 372 n.13, 692 A.2d 1217 (1997) (appellate courts ordinarily do not consider constitutional issues unless absolutely necessary to decision of case). At the same time, we recognize that our decision in part I hinges on a precedent decided 179 years ago that, as the state argues, appears incongruous with our code of evidence; see footnote 5; and, thus, likely will, at some point, be reconsidered by our Supreme Court. In the interest of judicial economy, we therefore deem it necessary to address the defendant's constitutional challenge.

[8] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review. *State* v. *Jarrett*, 82 Conn. App. 489, 492 n.1, 845 A.2d 476, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004).

provides: "No man may marry his mother, grandmother, daughter, granddaughter, sister, aunt, niece, stepmother or stepdaughter, and no woman may marry her father, grandfather, son, grandson, brother, uncle, nephew, stepfather or stepson. Any marriage within these degrees is void." The present case involves allegations of sexual intercourse between a stepfather and stepdaughter.

## A

### Similarly Situated

We first consider the nature of the classification created by § 53a-72a (a) (2). "[T]o implicate the equal protection [clause] . . . it is necessary that the state statute . . . in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . Thus, the analytical predicate [of consideration of an equal protection claim] is a determination of who are the persons similarly situated." (Internal quotation marks omitted.) *City Recycling, Inc.* v. *State*, 257 Conn. 429, 448, 778 A.2d 77 (2001). The defendant is challenging only the proscription of sexual intercourse between stepparent and stepchild in § 53a-72a (a) (2). He maintains that homosexual relationships are not included among those delineated in § 46b-21. As such, he argues that, by proscribing only heterosexual intercourse between kindred persons, § 53a-72a (a) (2) treats kindred persons who engage in same sex relations differently. By contrast, the state contends that, although not specifically described therein, the degrees of kindred specified in § 46b-21 encompass homosexual relationships.

In *Singh* v. *Singh*, 213 Conn. 637, 569 A.2d 1112 (1990), our Supreme Court examined the history of § 46-21. It stated: "In Connecticut, incest has been a crime since the incest statute was enacted in 1702 as part of 'An Act to prevent Incestuous Marriages'. . . . The

1702 act prohibited marriages between persons within certain degrees of kinship . . . . In the 1875 revision, the language describing the degree of relationship, now appearing in § 46b-21, was adopted. . . . There has been no substantive change in the language since that time. Thus, since 1702, our incest statute has interdicted marriage between persons related by either consanguinity or affinity." (Citations omitted.) Id., 643–44.

Section 46b-21 specifies numerous kindred relationships. None among them are homosexual. Moreover, the statute concerns marriage. Today, as in 1875, homosexuals cannot marry under Connecticut law. It follows, then, that homosexual relationships are beyond the purview of the degrees of kindred specified in § 46b-21.

We note further that unlike in 1875, Connecticut law today recognizes civil unions. See Public Acts 2005, No. 05-10 (P.A. 05-10). Section three of P.A. 05-10 largely replicates the language of § 46b-21. Public Acts 2005, No. 05-10, § 3, provides: "(a) A woman shall not enter into a civil union with her mother, grandmother, daughter, granddaughter, sister, brother's daughter, sister's daughter, father's sister or mother's sister. (b) A man shall not enter into a civil union with his father, grandfather, son, grandson, brother, brother's son, sister's son, father's brother or mother's brother. (c) A civil union between persons prohibited from entering into a civil union pursuant to subsection (a) or (b) of this section is void." That § 53a-72a (a) (2) has not been amended to encompass those relationships informs our consideration of whether it contemplates same sex relations.

Significantly, § 3 of P.A. 05-10 does not prohibit a stepparent from entering into a civil union with a stepchild.[9] The state's contention that § 53a-72a (a) (2)

---

[9] Such a union is conceivable to the extent that our General Assembly envisioned that a stepfather could otherwise marry his stepdaughter were it not for the provisions of General Statutes § 46b-21.

encompasses same sex relations between stepparent and stepchild, thus, yields an absurd result. Under the state's reading of § 53a-72a (a) (2), a stepfather and stepson can legally enter into a civil union in accordance with P.A. 05-10, but when those same individuals consummate said union, they commit sexual assault in the third degree. Our General Assembly could not reasonably have intended such a result. The state's interpretation strains even the most expansive limits of plausibility. Accordingly, for purposes of our equal protection analysis, we conclude that kindred persons engaged in homosexual relations are similarly situated to those engaged in heterosexual relations.

B

Standard of Review

When confronted with an equal protection challenge, a reviewing court must ascertain the standard by which the challenged statute's constitutional validity will be resolved. "If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard wherein the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . . If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge." (Internal quotation marks omitted.) *Ramos* v. *Vernon*, 254 Conn. 799, 829, 761 A.2d 705 (2000).

The defendant alleges that § 53a-72a (a) (2) discriminates against persons on the basis of sexual orientation.[10] Few are the decisions of the United States

[10] The defendant's equal protection claim is predicated on the guarantees of our state constitution, as well as those of the federal constitution. He has not engaged in an analysis pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Rather, the defendant simply points out that article first, § 20, of the constitution of Connecticut, as amended by articles

Supreme Court considering sexual orientation. In *Bowers* v. *Hardwick*, 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986), the court considered the constitutionality of a Georgia statute proscribing sodomy between consenting adults. In upholding the validity of the statute, the court refused to announce a fundamental right to engage in homosexual sodomy. Id., 191. The court further opined that a rational basis existed for the law, namely, the "belief of a majority of the electorate in Georgia that homosexual sodomy is immoral and unacceptable." Id., 196.

In *Romer* v. *Evans*, 517 U.S. 620, 623–24, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996), the Supreme Court invalidated, on equal protection grounds, an amendment to the Colorado constitution that prohibited governmental action designed to protect people on the basis of their sexual orientation. Quoting the first Justice Harlan, the court stated that the United States constitution "neither knows nor tolerates classes among citizens." (Internal quotation marks omitted.) Id., 623, quoting *Plessy* v. *Ferguson*, 163 U.S. 537, 559, 16 S. Ct. 1138, 41 L. Ed. 2d 256 (1896) (Harlan, J., dissenting). The *Romer* court declared that the amendment placed homosexuals in a solitary class, denying them legal protection from discrimination. *Romer* v. *Evans*, supra, 627. The court stated that "[b]y requiring that the classification bear a rational relationship to an independent and legitimate

five and twenty-one of the amendments, provides that "[n]o person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." While article first, § 20, as amended, forbids discrimination on the basis of sex, it does not contain a prohibition as to sexual orientation. By contrast, the General Statutes specifically reference sexual orientation. See, e.g., General Statutes §§ 45a-726a, 46a-81c, 46a-81r. The defendant has provided no analysis of whether our constitution provides greater protection than its federal counterpart as to sexual orientation. We therefore limit our review to the defendant's federal constitutional claim. See *Donahue* v. *Southington*, 259 Conn. 783, 794 n.7, 792 A.2d 76 (2002).

legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." Id., 633. It determined that there was no purpose for the amendment other than an animus toward homosexuals. Id., 631–32. For that reason, the court held that the classification was not rationally related to a legitimate government interest. Id., 632.

In 2003, the court expressly overruled *Bowers* in *Lawrence* v. *Texas*, 539 U.S. 558, 578, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003), which involved a Texas statute proscribing homosexual sodomy. Unlike in *Romer*, the court predicated its decision on the due process clause of the fourteenth amendment. Id., 565. The *Lawrence* court explained that "[t]he [homosexual] petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without the intervention of the government." Id., 578. The court concluded that "[t]he Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual."[11] Id. Accordingly, it held that a state cannot enact laws that criminalize homosexual sodomy.[12] Notably, *Lawrence* did not announce a fundamental right.[13]

---

[11] A search for a legitimate state interest typically signifies a rational basis analysis. See, e.g., *Romer* v. *Evans*, supra, 517 U.S. 632; *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 446; *Broadley* v. *Board of Education*, 229 Conn. 1, 9 n.16, 639 A.2d 502 (1994); *State* v. *Campbell*, 224 Conn. 168, 186, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993); *Zapata* v. *Burns*, 207 Conn. 496, 505, 542 A.2d 700 (1988).

[12] Although the target of harsh criticism; see, e.g., N. Lund & J. McGinnis, "*Lawrence* v. *Texas* and Judicial Hubris," 102 Mich. L. Rev. 1555, 1557 (2004) ("The *Lawrence* opinion is a tissue of sophistries embroidered with a bit of sophomoric philosophizing" that "deserves to be condemned"); *Lawrence* remains the law of the land.

[13] As Justice Scalia stated in his dissent in *Lawrence*, "[N]owhere does the Court's opinion declare that homosexual sodomy is a 'fundamental right' under the Due Process Clause; nor does it subject the Texas law to the

In her concurring opinion, Justice O'Connor distinguished the facts of *Lawrence* from those in *Bowers*, as the Texas statute did not apply equally to the conduct of homosexuals and heterosexuals alike. She stated: "Sodomy between opposite-sex partners, however, is

standard of review that would be appropriate (strict scrutiny) if homosexual sodomy *were* a 'fundamental right.' " (Emphasis in original). *Lawrence* v. *Texas*, supra, 539 U.S. 586 (Scalia, J., dissenting).

Furthermore, it is worth noting that, prior to *Lawrence*, three justices of the United States Supreme Court wrote opinions arguing that private adult consensual conduct should be treated as a fundamental right under the due process clause. *Hollenbaugh* v. *Carnegie Free Library*, 439 U.S. 1052, 99 S. Ct. 734, 58 L. Ed. 2d 713 (1978), involved a heterosexual couple who were discharged from their jobs in a public library due to their open cohabitation. In his dissent from the denial of certiorari, Justice Marshall defined the issue as the petitioners' "rights to pursue an open rather than a clandestine personal relationship and to rear their child together in this environment . . . ." Id., 1055 (Marshall, J., dissenting). He continued: "Petitioners' choice of living arrangements for themselves and their child is thus sufficiently close to the interests we have previously recognized as fundamental [and] it should not be relegated to the minimum rationality tier of equal protection analysis . . . ." Id., 1056 (Marshall, J., dissenting).

In another dissent from the denial of certiorari concerning two heterosexual public employees who were discharged from their jobs due to their relationship, Justice Brennan opined that "petitioners' lawful, off-duty sexual conduct clearly implicates the fundamental . . . right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." (Internal quotation marks omitted.) *Whisenhunt* v. *Spradlin*, 464 U.S. 965, 971, 104 S. Ct. 404, 78 L. Ed. 2d 345 (1983) (Brennan, J., dissenting). He further stated: "The intimate, consensual, and private relationship between petitioners involved both the 'interest in avoiding disclosure of personal matters, and . . . the interest in independence in making certain kinds of important decisions,' *Whalen* v. *Roe*, 429 U.S. 589, 599–600 [97 S. Ct. 869, 51 L. Ed. 2d 64] (1977), that our cases have recognized as fundamental. Therefore, the notice requirement of the Due Process Clause demands particular precision in this case." *Whisenhunt* v. *Spradlin*, supra, 971 (Brennan, J., dissenting).

Most significant is *Bowers* v. *Hardwick*, supra, 478 U.S. 186, which *Lawrence* expressly reconsidered and overruled. In his dissent, Justice Blackmun spoke of "the fundamental interest all individuals have in controlling the nature of their intimate associations with others." Id., 206 (Blackmun, J., dissenting). That interest must be protected, Justice Blackmun stated, because such intimate associations "form so central a part of an individual's life." Id., 204 (Blackmun, J., dissenting). In recognizing a liberty interest of consenting adults to engage in private sexual conduct; see *Lawrence* v.

not a crime in Texas. That is, Texas treats the same conduct differently based solely on the participants." Id., 581 (O'Connor, J., concurring). Engaging in an equal protection analysis, Justice O'Connor explained that "[w]e have been most likely to apply rational basis review to hold a law unconstitutional under the Equal Protection Clause where, as here, the challenged legislation inhibits personal relationships." Id., 580 (O'Connor, J., concurring). The Texas statute, she continued, "makes homosexuals unequal in the eyes of the law by making particular conduct—and only that conduct—subject to criminal sanction." Id., 581 (O'Connor, J., concurring). Because "Texas cannot assert any legitimate state interest," Justice O'Connor concluded that the classification fails rational basis review.[14] Id., 585 (O'Connor, J., concurring).

In the wake of *Lawrence*, other courts have considered the appropriate standard of review for assessing sexual orientation challenges. See *Muth* v. *Frank*, 412 F.3d 808, 817 (7th Cir.) (*Lawrence* did not announce fundamental right; refusal to apply strict scrutiny confirms that court was not creating new fundamental right), cert. denied, 546 U.S. 988, 126 S. Ct. 575, 163 L. Ed. 2d 480 (2005); *Johnson* v. *Johnson*, 385 F.3d 503, 532 (5th Cir. 2004) ("[n]either the Supreme Court nor this court has recognized sexual orientation as a suspect classification [or protected group]; nevertheless, a state

---

*Texas, supra*, 539 U.S. 578; the *Lawrence* court made no mention of these opinions.

[14] For a more detailed discussion of the equal protection analysis in *Lawrence*, see M. Peterson, "The Right Decision for the Wrong Reason: The Supreme Court Correctly Invalidates the Texas Homosexual Sodomy Statute, But Rather than Finding an Equal Protection Violation in *Lawrence* v. *Texas*, the Court Incorrectly and Unnecessarily Overrules *Bowers* v. *Hardwick*," 37 Creighton L. Rev. 653 (2004). The commentator concludes that because "[i]n *Lawrence*, the Texas statute's classification of homosexuals versus heterosexuals did not further a legitimate government interest; therefore, the Court should have invalidated the Texas statute on the basis of equal protection." Id., 693.

violates the Equal Protection Clause if it disadvantages homosexuals for reasons lacking any rational relationship to legitimate governmental aims"); *Lofton* v. *Secretary of Dept. of Children & Family Services*, 358 F.3d 804, 817 (11th Cir. 2004) (concluding it would be "a strained and ultimately incorrect reading of *Lawrence* to interpret it to announce a new fundamental right"), cert. denied, 543 U.S. 1081, 125 S. Ct. 869, 160 L. Ed. 2d 825 (2005); *Standhardt* v. *Superior Court*, 206 Ariz. 276, 283–85, 77 P.3d 451 (2003) (no fundamental right to same sex marriage where *Lawrence* did not recognize fundamental right to engage in same sex relations); *People* v. *Downin*, 357 Ill. App. 3d 193, 200, 828 N.E.2d 341 (*Lawrence* did not conclude that sodomy or any other sexual activity is fundamental right and was resolved through application of rational basis test), leave to appeal denied, 216 Ill. 2d 703, 839 N.E.2d 1029 (2005); *Samuels* v. *Dept. of Health*, 29 App. Div. 3d 9, 15, 811 N.Y.S.2d 136 (2006) (rational review applies to assertions of sexual orientation discrimination).

Particularly noteworthy is the recent decision of the Supreme Court of Kansas in *State* v. *Limon*, 280 Kan. 275, 122 P.3d 22 (2005). Like *Lawrence, Limon* presents a case in which statutory punishment for certain unlawful conduct did not apply equally to the conduct of homosexuals and heterosexuals alike. As the court recounted, the Kansas statute "results in a punishment for unlawful voluntary sexual conduct between members of the opposite sex that is less harsh than the punishment for the same conduct between members of the same sex." Id., 276. The defendant claimed that the statute "create[d] a classification of homosexuals which the *Lawrence* [c]ourt recognized as suspect." Id., 286. The court disagreed: "Contrary to this argument, the United States Supreme Court has not recognized homosexuals as a suspect classification. . . . [S]trict scrutiny does not apply to our analysis of whether the

[statute] unconstitutionally discriminates based upon sexual orientation." (Citations omitted.) Id. The court therefore concluded that the rational basis test was the proper standard by which to consider the defendant's equal protection claim. Id., 287. Because the state could not proffer any legitimate state interest, the classification failed that scrutiny. Id., 301.

The foregoing precedents reflect that the United States Supreme Court has not recognized homosexuals as a suspect classification, nor has it deemed same sex relations a fundamental right. The appropriate test, therefore, by which to determine whether the classification contained in § 53a-72a (a) (2) is constitutional is to inquire whether the legislative classification is founded on a rational basis.

Under that deferential standard of review, a legislative classification must be rationally related to a legitimate government interest. *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 446; *Zapata* v. *Burns*, 207 Conn. 496, 505, 542 A.2d 700 (1988). Rational basis review is satisfied "so long as there is a plausible policy reason for the classification . . . the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decisionmaker . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational . . . ." (Citations omitted; internal quotation marks omitted.) *City Recycling, Inc.* v. *State*, supra, 257 Conn. 445. "A statute does not constitute a denial of the equal protection of the laws merely because it extends to some persons privileges denied to others, or imposes restrictions or liabilities on some but not on others. Such discriminations render legislation void where they are arbitrary or unreasonable, but not where they are based on real differences in the subject-matter and are reasonable in extent." (Internal quotation marks omitted.) *Sil-*

*ver* v. *Silver*, 108 Conn. 371, 378, 143 A. 240 (1928), aff'd, 280 U.S. 117, 50 S. Ct. 57, 74 L. Ed. 221 (1929). "The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." (Internal quotation marks omitted.) *City Recycling, Inc.* v. *State*, supra, 446. At the same time, rational basis review is not merely a toothless scrutiny. See *Mathews* v. *Lucas*, 427 U.S. 495, 510, 96 S. Ct. 2755, 49 L. Ed. 2d 651 (1976).

C

The State's Proffered Basis

In an attempt to satisfy this deferential standard, the state proffers only one ground to justify the prohibition of heterosexual, rather than homosexual, intercourse between kindred persons contained in § 53a-72a (a) (2): the prevention of genetic defects due to inbreeding. Citing the Encyclopedia Britannica, the state argues that "[n]umerous deleterious effects appear to be associated with genetic inbreeding, such as hereditary diseases and malformations, along with decreased vigour, size and fertility of the offspring . . . ." (Internal quotation marks omitted.)

Although the legislature need not articulate the basis for the classification relied on by the state; see *Nordlinger* v. *Hahn*, 505 U.S. 1, 15, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992); *Ramos* v. *Vernon*, supra, 254 Conn. 832; we begin with an examination of the legislative record to determine if a purpose for the classification is suggested therein.[15]

The General Assembly amended § 53a-72a in 1980 to add subdivision (a) (2). See Public Acts 1980, No. 80-

[15] At oral argument, the state insisted that there "must be a reason for the legislature to have added this language to the third degree assault statute." Neither the state nor the defendant discussed legislative history in their briefs.

346, § 1 (P.A. 80-346). As amended, it provides that a person is guilty of sexual assault in the third degree when such person "engages in sexual intercourse with another person whom the actor knows to be related to him or her within any of the degrees of kindred specified in section 46b-21."

A review of the legislative history of P.A. 80-346 indicates that its sole purpose was to protect victims of incest. Senator Alfred Santaniello, Jr., introduced the bill before the Senate by explaining that "[t]his bill would really just change the title. Crimes that are now classified as incest would be classified as sexual assault in the third degree and the reason for that is to try to remove some of the stigma of the victims of the crime. . . . [T]he important part about the bill is the changing of the title and the protection of the victim." 23 S. Proc., Pt. 9, 1980 Sess., p. 2934. Representative Richard D. Tulisano summarized the amendment before the House of Representatives as follows: "[The bill] maintains that marriage without sexual intercourse would still be incest under the existing statute. In effect, what this legislation does is maintain as a Class B felony incest and the title of incest for one who marries within the degrees of kindred already prohibited in law but shifts to the sexual assault statutes as Class B felonies as existing law that of sexual intercourse, because it has been felt by many people interested in this legislation that children whose parent might be arrested, might be better served if no one would know that they were the object of an incestuous relationship." 23 H.R. Proc., Pt. 11, 1980 Sess., p. 3107.

Representative Tulisano further commented that "the purpose of the bill is to shelter to some extent the victims of incestuous relationships. . . . [S]omething to shelter children from adverse publicity." Id., p. 3110. Representative John N. DeMerell stated that "the thrust of this [bill is] to protect the victims of what is a most

unfortunate behavior pattern"; id., p. 3114; and Representative Muriel Yacavone expressed her concern "for the children and youths who are victims of adult criminal behavior. . . . I think it's a very, very important bill for the protection of our young people." Id., p. 3115. Finally, Patricia Graves testified before the judiciary committee and expressed her support for P.A. 80-346 and the aim of protecting the victims of the offense of incest. She stated: "[T]he crime of incest identifies its victim through newspaper publicity at which point in time when we, as a police agency, make an arrest for the crime of incest, we have immediately identified not the individual, but a member of the family as being a victim of this offense. . . . [By] hiding it within the sexual assault statute, therefore we would not be identifying the victim." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1980 Sess., p. 909.

The legislative record is silent as to the state's proffered basis for the classification at issue in the present appeal. It reveals but one purpose for the amendment, the protection of incest victims. Inbreeding was not a concern addressed, nor its prevention a purpose discussed, in the legislative record. That legislative history informs our analysis of the defendant's equal protection claim. See *City Recycling, Inc.* v. *State,* supra, 257 Conn. 449.

It does not, however, foreclose the possibility that inbreeding is a rational basis. As our Supreme Court has explained, "[t]he test . . . is whether this court can conceive of a rational basis for sustaining the legislation; we need not have evidence that the legislature actually acted upon that basis." (Internal quotation marks omitted.) *Donahue* v. *Southington,* 259 Conn. 783, 796, 792 A.2d 76 (2002). At the same time, rational basis review requires that a legitimate state interest must possess a purpose "that we may reasonably presume to have motivated an impartial legislature." (Inter-

nal quotation marks omitted.) *Nordlinger* v. *Hahn,* supra, 505 U.S. 34.

We therefore focus our attention on the basis provided by the state. "The question of classification is primarily one for the legislature, and the courts will not interfere unless a classification presented by statute is clearly irrational and unreasonable." *State* v. *Rao,* 171 Conn. 600, 603, 370 A.2d 1310 (1976). Legislative classification is not an exact science; *Califano* v. *Boles,* 443 U.S. 282, 293–94, 99 S. Ct. 2767, 61 L. Ed. 2d 541 (1979); and perfection is not required. *Dandridge* v. *Williams,* 397 U.S. 471, 485, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970). A classification must merely "be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." (Internal quotation marks omitted.) *Zapata* v. *Burns,* supra, 207 Conn. 507. Our Supreme Court further has stated that "[a]lthough rational basis review . . . permits 'an imperfect fit between means and ends' . . . there is a limit to the hypothesizing that we will undertake in order to sustain the constitutionality of a statute." (Citation omitted.) *City Recycling, Inc.* v. *State,* supra, 257 Conn. 452–53. The critical inquiry is, thus, whether the relationship between the classification embodied in § 53a-72a (a) (2) and the inbreeding justification is so attenuated as to render the distinction irrational.

Inbreeding is defined as "mating between organisms that are genetically more closely related than organisms selected at random from the population." T. Stedman, Medical Dictionary (27th Ed. 2000) p. 886. It involves only persons related by consanguinity. Yet the degrees of kindred described in § 46b-21, by its express terms, plainly include persons related by affinity, and have for well over a century. See *Singh* v. *Singh,* supra, 213 Conn. 644. It is axiomatic that every word and phrase

in a statute is presumed to have meaning. *Vibert* v. *Board of Education*, 260 Conn. 167, 176, 793 A.2d 1076 (2002). Because we must presume that the legislature did not intend to enact meaningless provisions, "care must be taken to effectuate all provisions of the statute." (Internal quotation marks omitted.) *State* v. *Gibbs*, 254 Conn. 578, 602, 758 A.2d 327 (2000). To accept the state's proffered basis would require us to turn a blind eye to the fact that the statute applies to persons incapable of inbreeding. Even more significantly, it would require us to presume that the legislature, aware of this critical distinction, chose to ignore it.

The inescapable infirmity of the state's proffered basis for the classification here involved is that it pertains to only a portion of those relationships governed by the statute. "The standard of what is arbitrary and unreasonable is not rigid. . . . [T]he question is usually one of degree." (Internal quotation marks omitted.) *Miller* v. *Heffernan*, 173 Conn. 506, 515, 378 A.2d 572 (1977), appeal dismissed, 434 U.S. 1057, 98 S. Ct. 1226, 55 L. Ed. 2d 758 (1978); see also *Silver* v. *Silver*, supra, 108 Conn. 378 (classification must be reasonable in extent). The breadth of § 53a-72a (a) (2) is sweeping. The classification contained therein includes not only heterosexual persons related by consanguinity, but persons related by affinity as well. Furthermore, § 53a-72a (a) (2) encompasses adopted relatives. *State* v. *George B.*, 258 Conn. 779, 796, 785 A.2d 573 (2001). The dangers of inbreeding are inapplicable, and hence irrelevant, to sexual intercourse between persons related by affinity or adoption. Even more basic is the fact that certain persons are incapable of inbreeding, be it attributable to sterility or elderliness. As previously noted, the legislative record reveals that inbreeding was not a factor considered by the General Assembly in amending § 53a-72a to add subsection (a) (2). To conclude that the state's proffered basis is rational, it must be one that we

may reasonably presume to have motivated an impartial legislature. *Nordlinger* v. *Hahn*, supra, 505 U.S. 34. In light of the foregoing, we conclude that the relationship of the classification to the proffered goal is so attenuated as to render the distinction arbitrary and irrational. Accordingly, the prevention of genetic defects due to inbreeding is not a rational basis for the classification involved in § 53a-72a (a) (2).

D

Other Conceivable Bases

The state has not provided an alternative basis to justify the proscription of heterosexual, rather than homosexual, intercourse between kindred persons contained in § 53a-72a (a) (2). Although other jurisdictions seldom have addressed the issue of inbreeding, those which have note that moral disapprobation is closely intertwined with that issue. One half century ago, the New Hampshire Supreme Court stated that the purpose of that state's incest statute "was not only to protect society against the evils of inbreeding but also against the socially and morally undesirable consequences of sexual relations under any circumstances between persons within the prohibited degrees of relationship." *State* v. *Geddes*, 101 N.H. 164, 165, 136 A.2d 818 (1957). One New York court further expounded on this moral basis: "The basis of the [incest] statute . . . is found in the Bible, in usage, as well as I might say, in science. The experience of mankind has taught that eugenically, marriages in such close relationships as first cousins, aunts and nephews, uncles and nieces, etc., result in the inbreeding of the vicious propensities that may, and are likely to be in any family group. The crossing of strains is very helpful and of desirable consequence. Marriage in close degrees is repugnant to decency. It has come to be regarded as unnatural. As man rises in civilization and in culture, he discards brute and

primitive characteristics and habits to the extent that they appear to him, not only to be repellant, but unnatural." *Matter of Incuria*, 155 Misc. 755, 757, 280 N.Y.S. 716 (1935).

Society's belief that certain forms of sexual behavior are "immoral and unacceptable" was found to be a rational basis in *Bowers* v. *Hardwick*, supra, 478 U.S. 196. In *Lawrence* v. *Texas*, supra, 539 U.S. 558, the court abandoned that conclusion. It stated: "It must be acknowledged, of course, that the Court in *Bowers* was making the broader point that for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives. These considerations do not answer the question before us, however. . . . Our obligation is to define the liberty of all, not to mandate our own moral code." (Internal quotation marks omitted.) Id., 571. The court continued: "The rationale of *Bowers* does not withstand careful analysis. In his dissenting opinion in *Bowers*, Justice Stevens [stated that] the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice . . . . Justice Stevens' analysis, in our view, should have been controlling in *Bowers* and should control here." (Internal quotation marks omitted.) Id., 577–78. The *Lawrence* court therefore concluded that the Texas statute proscribing homosexual sodomy furthered "no legitimate state interest" and, hence, failed to satisfy rational basis review.[16] Id., 578.

---

[16] In *State* v. *Limon*, supra, 280 Kan. 294, which, like the present case, involved statutory punishment that did not apply equally to the conduct of homosexuals and heterosexuals alike, the Supreme Court of Kansas stated

Thus, although § 53a-72a (a) (2) may have been enacted to avoid the socially and morally undesirable consequences of sexual relations between persons within the prohibited degrees of relationship; see *State* v. *Geddes*, supra, 101 N.H. 165; under *Lawrence*, that alone provides an insufficient basis for upholding the classifications contained therein.[17]

The moral disapprobation basis is further undermined by the facts of the present case. If sexual intercourse between a stepfather and stepdaughter is considered by society to be immoral and unacceptable, its repugnancy stems from the fact that the act involves related persons. See id.; *Matter of Incuria*, supra, 155 Misc. 757. Certainly sexual intercourse between stepfather and stepson is as equally repugnant as that between stepfather and stepdaughter. Whatever the societal disapproval that exists as to sexual relations between related persons, it is, in a word, irrelevant to the present case.

A final basis raised not by the state but by the decisional law of other jurisdictions merits attention. Whether termed the promotion of "domestic peace and purity"; *Smith* v. *State*, 6 S.W.3d 512, 520 (Tenn. Crim. App.), appeal denied (September 14, 1999); or the "integrity of the family"; *Camp* v. *State*, 288 Ark. 269, 273, 704 S.W.2d 617 (1986); the preservation of the family is a frequently proffered basis in cases involving incest. As the Court of Appeals of Washington

that "[t]he *Lawrence* decision rejected a morality-based rationale as a legitimate [s]tate interest." Accordingly, that court concluded that moral disapproval is not a legitimate justification for discrimination. Id., 294–95.

[17] As Justice Scalia noted in his dissent in *Lawrence*, society's belief that certain forms of sexual behavior are immoral and unacceptable "is the same justification that supports many other laws regulating sexual behavior that make a distinction based upon the identity of the partner—for example, laws against adultery, fornication, and adult incest, and laws refusing to recognize homosexual marriage." *Lawrence* v. *Texas*, supra, 539 U.S. 600 (Scalia, J., dissenting).

explained, incest is punished "to promote and protect family harmony, to protect children from the abuse of parental authority, and because society cannot function in an orderly manner when age distinctions, generations, sentiments and roles in families are in conflict." *State* v. *Kaiser*, 34 Wash. App. 559, 566, 663 P.2d 839, review denied, 100 Wash. 2d 1004 (1983). Ironically, that basis undermines the position of the state in the present case. If "sexual activity is equally disruptive, whatever the makeup of the family," as the Supreme Court of Arkansas has stated; *Camp* v. *State*, supra, 273; there is little justification for proscribing sexual intercourse between stepfather and stepdaughter, but not between stepfather and stepson.

The aforementioned cases recognize the legitimate state interest in prohibiting sexual acts between related persons. The respective statutes at issue in those decisions prohibit sexual acts between related persons without regard to heterosexual or homosexual relations.[18] Section 53a-72a (a) (2) of our General Statutes, however, does not apply equally to the conduct of homosexual and heterosexual relations alike. To paraphrase Justice O'Connor, Connecticut treats the same conduct

[18] *Camp* v. *State*, supra, 288 Ark. 270, involved Ark. Stat. Ann. § 41-2403, now § 5-26-202, which provides that "a person commits incest if, being sixteen years of age or older, he purports to marry, has sexual intercourse with, or engages in deviate sexual activity with, a person he knows to be (a) an ancestor or a descendant; or (b) a stepchild or adopted child." The defendant in *Smith* v. *State*, supra, 6 S.W.3d 518 n.9, was prosecuted under Tenn. Code Ann. § 39-15-302 (a), which provides that "[a] person commits incest who engages in sexual penetration . . . with a person, knowing such person to be, without regard to legitimacy: (1) The person's natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, adoptive child; or (2) The person's brother or sister of the whole or half-blood or by adoption." Finally, the incest statute in *State* v. *Kaiser*, supra, 34 Wash. App. 559, provides in relevant part that "[a] person is guilty of incest if he engages in sexual intercourse with a person whom he knows to be related to him, either legitimately or illegitimately, as an ancestor, descendant, brother, or sister of either the whole or the half blood." (Internal quotation marks omitted.) Id., 560 n.1.

differently based solely on the participants. See *State v. Lawrence*, supra, 539 U.S. 581 (O'Connor, J., concurring). That infirmity is insurmountable under even the most deferential standard of constitutional scrutiny.

### E

### Conclusion

This court is mindful that "[t]he question of classification is primarily one for the legislature, and the courts will not interfere unless a classification presented by statute is clearly irrational and unreasonable." *State v. Rao*, supra, 171 Conn. 603. We are also mindful of the sagacious words of Justice Holmes: "When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas & Electric Co. v. Coleman*, 277 U.S. 32, 41, 48 S. Ct. 423, 72 L. Ed. 770 (1928) (Holmes, J., dissenting). Under § 53a-72a (a) (2), sexual intercourse between a stepfather and stepdaughter is prohibited, but sexual intercourse between a stepfather and stepson is not. We can conceive of no rational basis for that distinction. Indeed, it is very wide of any reasonable mark.[19] We therefore conclude that § 53a-72a (a) (2) violates the guarantees of equal protection.

---

[19] A classification is no less arbitrary because it is probable that the unequal operation of the statute was due to inadvertence rather than design. *F.S. Royster Guano Co.* v. *Virginia*, 253 U.S. 412, 416, 40 S. Ct. 560, 64 L. Ed. 989 (1920); see also *Carroll* v. *Socony-Vacuum Oil Co.*, 136 Conn. 49, 63, 68 A.2d 299 (1949) ("if the General Assembly acted inadvertently, that fact would not give any additional validity to the law").

The judgment is reversed and the case is remanded with direction to render judgment of not guilty.

In this opinion HARPER, J., concurred.

SCHALLER, J., concurring. Although I agree with and join fully in part I of the majority opinion, I write separately to note my disagreement with the necessity and propriety of addressing the defendant's constitutional claim that General Statutes § 53a-72a (a) (2) violates his right to equal protection under the law. Whether I agree or disagree with the reasoning in part II of the majority's opinion is not relevant. I believe that "[t]his court has a basic duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case." *Moore* v. *McNamara*, 201 Conn. 16, 20, 513 A.2d 660 (1986). In the present situation, part I of the opinion fully resolves the case. No need exists for this court to address the constitutional claim under the present circumstances. Whether our Supreme Court may choose to reconsider the precedent set forth in *State* v. *Roswell*, 6 Conn. 446 (1827), or to address the constitutional issue at some later time, should have no bearing on our present responsibility. As a reviewing court, our obligation is clearly to avoid unnecessary constitutional adjudication. *State* v. *Falcon*, 68 Conn. App. 884, 886, 793 A.2d 274, cert. denied, 260 Conn. 924, 797 A.2d 521 (2002), overruled on other grounds, *State* v. *D'Antonio*, 274 Conn. 658, 692 n.20, 877 A.2d 696 (2005) (en banc).

Our Supreme Court expressly has instructed that appellate courts should avoid deciding constitutional issues where possible. "It is axiomatic that courts do not engage in constitutional analysis if a nonconstitutional basis upon which to resolve an issue exists." *Shelton* v. *Statewide Grievance Committee*, 277 Conn. 99, 107, 890 A.2d 104 (2006). We have explained that "[t]his

court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case. . . . The best teaching of this [c]ourt's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity. . . . Appropriate deference to a coordinate branch of government exercising its essential functions demands that we refrain from deciding constitutional challenges to its enactments until the need to do so is plainly evident." (Internal quotation marks omitted.) *State* v. *Stern*, 65 Conn. App. 634, 638, 782 A.2d 1275, cert. denied, 258 Conn. 935, 785 A.2d 232 (2001). I am also mindful that our Supreme Court has held that where a defendant's insufficiency of evidence claim is meritorious, all of his or her remaining claims are moot. *State* v. *Munoz*, 233 Conn. 106, 110, 659 A.2d 683 (1995). In my view, in light of these well established principles, we should not address this defendant's constitutional claim.

For the foregoing reasons, I concur in the result reached in part I of the majority opinion.