## ELIZABETH KERRIGAN ET AL. *v.* COMMISSIONER OF PUBLIC HEALTH ET AL.*

Superior Court, Judicial District of New Haven
File No. CV-04-4001813

Memorandum filed July 12, 2006

* Reversed. *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 957 A.2d 407 (2008).

*Maureen M. Murphy*, for the plaintiffs.

*Jane R. Rosenberg*, assistant attorney general, with whom were *Richard Blumenthal*, attorney general, and *Susan Quinn Cobb* and *Robert W. Clark*, assistant attorneys general, for the defendants.

PITTMAN, J. The 2005 session of the Connecticut General Assembly took the courageous and historic step of conferring on same sex couples who register their relationship with the state the same rights granted to opposite sex couples who do so. Governor M. Jodi Rell signed the bill into law, to take effect on October 1, 2005. In passing this legislation, Public Acts 2005, No. 05-10 (P.A. 05-10), the General Assembly reserved the term "marriage" for the union of couples of the opposite sex and adopted the term "civil union" for the union of couples of the same sex. Compare P.A. 05-10, § 2, with § 14.

The plaintiffs in this lawsuit—eight same sex couples—ask the court to declare that this distinction violates the Connecticut constitution. They ask the court to remedy this infirmity by issuing a declaratory judgment and ordering a mandatory injunction compelling the defendants to issue to each plaintiff couple a marriage license, as opposed to a civil union license. Notwithstanding P.A. 05-10, the plaintiffs allege that they are denied the equal protection of law, the due process of law, and the right of free expression and association. They have moved for summary judgment.

The defendants respond by denying that the law discriminates against the plaintiffs. The defendants likewise move for summary judgment, arguing that the plaintiffs cannot make the required showing that the denial of a marriage license, and instead the issuance of a civil union license, is unconstitutional.

For reasons set forth herein, the court finds that the plaintiffs have failed to prove that they have suffered any legal harm that rises to constitutional magnitude. That being so, the defendants are entitled to summary judgment.

I

## HISTORY OF THIS LITIGATION

The plaintiffs, originally numbering seven couples, commenced this action on August 24, 2004, with service of process on the defendants. The defendants are the commissioner of public health, J. Robert Galvin, who oversees the state department of public health, and Dorothy C. Bean, acting town clerk and acting registrar of vital statistics for the town of Madison, the town where each of the couples had asked to complete a marriage license application. The defendants appeared by counsel, the commissioner of public health represented by the attorney general, and the Madison town clerk by the Madison corporation counsel. The parties cooperated in agreeing to the form of an order of notice issued by the court to alert all town clerks throughout the state of the pendency of this action and of the request for a declaratory judgment relative to their official duties regarding the issuance of marriage licenses.

The verified allegations of the plaintiffs tell individual and highly personal stories, although the allegations can fairly be summarized generally. Each plaintiff is in a committed, loving relationship of substantial duration

with a member of the same sex, and each plaintiff desires to be covered by the rights, benefits and protections of the laws of Connecticut available to married persons.

Many of the couples have children, by birth or adoption, in their households. Some plaintiffs have struggled to care for the aging parent of one partner of the couple. Some have experienced past or incipient health issues of their own. Some have had financial challenges because of the lack of employment, lack of affordable health insurance or lack of other common spousal benefits of one partner in the couple. All plaintiffs allege the intention to create a concrete life plan that, if they could marry, would afford them substantial rights, benefits and protections on which they could not otherwise rely because of the prohibition on same sex marriage.

Among the benefits to which these plaintiffs sought access in their original complaint were the ability to visit and care for one another during hospital admissions, to participate in end of life decision making, to provide and receive dependent health insurance coverage, to engage in financial and tax planning advantages conferred by state law and to establish binding family relationships especially for the benefit of the children of these couples. Many of the plaintiffs had encountered unfair, and occasionally frightening, denials of these benefits because there was no method by which their public status as a couple or as next of kin could be legally recognized.

For example, in the original complaint, one of the plaintiff couples, Janet Peck and Carol Conklin, alleged that the failure of the state to grant them a marriage license had resulted in at least four types of concrete harm to them: (1) in 1996, when Peck was recovering from surgery in a hospital intensive care unit, Conklin

was initially prevented from visiting her because Conklin was not recognized as having a kinship connection to Peck. When Peck was hospitalized again in 2003, Peck was not permitted to designate Conklin as next of kin on hospital forms for visitation and other purposes; (2) in 2002, the couple was denied a home construction loan because they were not seen as having a "joint income," since they were not a married couple; (3) over a period of fifteen years, when each of them was self-employed (they have been together nearly thirty years), they paid for two separate health insurance policies, although, if they had been able to marry, one of them could have insured the other as a dependent on a single health insurance policy at a substantially lower premium than that of the cost of two separate policies; and (4) adding insult to injury, they were not considered spouses for purposes of allowing Conklin to inherit the UConn women's basketball tickets that are in Peck's name, should Peck predecease Conklin, under the point system utilized by the University of Connecticut in determining rights to possession of such tickets.

They and the other plaintiffs claimed in the original complaint that they were otherwise eligible to marry but that they were prevented by the state from doing so because the eligible partner with whom each shared a commitment was of the same sex, whereas if the intended partner had been of the opposite sex, the state would unquestioningly have issued a marriage license to the couple. The plaintiffs alleged that they were denied "the legal and social status of a marital relationship, and the protections, rights, and responsibilities—financial, legal, emotional and others—afforded to married couples." Then, as now, the plaintiffs alleged that the prohibition on marriage between persons of the same sex violates the Connecticut constitution.

II

## THE LEGISLATIVE CHANGE

The state of Connecticut has been notable in recent years for its incremental but steady progress in the recognition of basic human rights, including the rights of members of formerly oppressed groups. In 1969, the state decriminalized homosexual conduct between consenting adults. See Public Acts 1969, No. 828, § 214. In 1974, the state amended the equal protection clause of its constitution to extend the guarantee of equal protection of law to women. See Conn. Const., amend. V. In 1984, the equal protection clause of the constitution was amended again to include physically and mentally disabled persons. See Conn. Const., amend. XXI.

In 1991, the legislature passed Public Acts 1991, No. 91-58, to prohibit discriminatory practices against persons who identify themselves as gay, lesbian or bisexual. The act covered the areas of employment, housing, public accommodations, credit practices, educational services, licensure programs and allocation of tangible state benefits. See General Statutes §§ 46a-81a through 46a-81r. The act further allowed, but did not require, the placement of children for adoption or foster care in the homes of homosexual or bisexual persons. See General Statutes § 45a-726a.

Then in 2000, the legislature passed Public Acts 2000, No. 00-228 (P.A. 00-228), which specifically allowed a coparenting partner to adopt a child without reference to whether the partner was of the same sex or the opposite sex of the other coparent. See General Statutes § 45a-727 (a) (3) (D). The public act declined to further define the rights and responsibilities of the coparents to one another; see General Statutes § 45a-727b; recognizing that opposite sex marriage (and the absence of any provision for a civil union) was then the "current"

public policy of the state. See General Statutes § 45a-727a (4).

In 2005, the General Assembly took up the issue of same sex unions head on. After years of study and debate on the implications of such a policy, the legislature passed P.A. 05-10, rewriting the law of the state to allow such unions. The governor signed the act, and it became law on October 1, 2005.

The act permits eligible same sex couples to obtain civil union licenses. The requirements of age,[1] status as a single person and lack of consanguinity are otherwise identical or substantially similar for same sex and opposite sex couples.

The substantive language of the statute is exceedingly broad. In defining the rights of persons entitled to be joined in a civil union, § 14 of the act states: "Parties to a civil union shall have all the same benefits, protections and responsibilities under law, whether derived from the general statutes, administrative regulations or court rules, policy, common law or any other source of civil law, as are granted to spouses in a marriage, which is defined as the union of one man and one woman."

Despite restricting the term "marriage" solely to opposite sex couples, the statute mandates that terms that have been historically and linguistically related to the marital relationship such as "spouse," "family," "immediate family," "dependent" and "next of kin" be regarded as expanded to include a party to a civil union in such use or definition.[2] P.A. 05-10, § 15.

---

[1] Civil union spouses and married spouses must be at least eighteen years old, except that certain procedures exist for persons younger than age eighteen to obtain marriage licenses, either by parental consent or by consent of a judge of probate. Compare P.A. 05-10, § 10, with General Statutes § 46b-30 (a) and (b). There are no procedural exceptions for civil union licenses to be issued to those younger than age eighteen. None of these plaintiffs is affected by this distinction.

[2] Many government forms are being revised to reflect the appropriate statutory terminology. For example, within months of the enactment of the

Although this lawsuit was pending at the time of the General Assembly's actions, the legislature passed P.A. 05-10 free of any judicial mandate or command. Cf. *Opinion of the Justices to the Senate*, 440 Mass. 1201, 802 N.E.2d 565 (2004); *Goodridge* v. *Dept. of Public Health*, 440 Mass. 309, 798 N.E.2d 941 (2003); *Baker* v. *State*, 170 Vt. 194, 744 A.2d 864 (1999).

## III

## THE AMENDED COMPLAINT OF PLAINTIFFS

Shortly after the passage of P.A. 05-10, the plaintiffs filed an amended complaint, dated March 29, 2005. The amended complaint added an eighth plaintiff couple to the original group of seven. No mention was made in the amended complaint of the passage of P.A. 05-10 or of the effect that its broad ranging mandate would have on the same sex couples who chose to be united under the new law. The defendants filed an answer dated April 19, 2005, denying that their refusal to grant marriage licenses to the plaintiffs was unconstitutional.

## IV

## THE CLAIMS OF UNCONSTITUTIONALITY

The plaintiffs present three claims of unconstitutionality: that the denial of a marriage license to eligible same sex couples (1) violates the equal protection provisions of article first, §§ 1 and 20, of the Connecticut constitution;[3] (2) violates the due process provisions of

new legislation, the Juror Questionnaire Form JD-JA-5a was revised as follows: "If Married or a Party to a Civil Union, state the full name, occupation and employer of spouse."

[3] Article first, § 1, of the constitution of Connecticut, provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

article first, §§ 8 and 10, of the Connecticut constitution;[4] and (3) violates the rights of intimate and expressive association of article first, §§ 4, 5 and 14, of the Connecticut constitution.[5]

## V

## THE MOTIONS FOR SUMMARY JUDGMENT

The plaintiffs have moved for summary judgment, as have the defendants. Practice Book § 17-49 provides in relevant part that summary judgment is appropriate "if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Both sides agree that this matter is appropriate for summary judgment, as there are no material facts in dispute.

The papers of the plaintiffs in support of summary judgment contain affidavits from all plaintiffs. Each affidavit explains the effect that the inability to obtain a marriage license in Connecticut has had on that plaintiff and those close to that plaintiff.

For example, Elizabeth Kerrigan, the named plaintiff, feels that the government views her relationship as

---

[4] Article first, § 8, of the constitution of Connecticut, provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Article first, § 10, of the constitution of Connecticut, provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[5] Article first, § 4, of the constitution of Connecticut, provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

Article first, § 5, of the constitution of Connecticut, provides: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press."

Article first, § 14, of the constitution of Connecticut, provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

unequal to and less worthy than a heterosexual marriage. Carol Conklin feels that "civil unions say to me that I am . . . not good enough for marriage." Jeffrey Busch feels that he is "an outsider and a second-class citizen, in the eyes of the government and society generally," a feeling that to him is "humiliating." Plaintiffs Damaris Navarro and Gloria Searson, who have already entered into a civil union in Vermont, are concerned because "civil unions do not have anywhere near the same common cultural recognition and respect that marriage has." Barbara Levine-Ritterman and Robin Levine-Ritterman were married by a rabbi in a reform Jewish religious service in 1992; they proudly display their handsome ketubah (marriage contract) on a wall of their home. To them, the concept of civil union "feels inferior and demeaning" compared to marriage, and is "a foreign concept that requires an explanation." Suzanne Artis wishes to "communicate really simply" that she and Geraldine Artis are in a committed relationship for life, a statement that can only be conveyed by becoming married. J. E. Martin feels that only if she becomes married to Denise Howard could she confidently say, "This is my spouse, Denise," to others who have so far misunderstood the commitment shared by Martin and Howard.

The defendants do not challenge the sentiments of the plaintiffs as expressed in these affidavits. The position of the defendants is that the sentiments expressed and the conclusions drawn by the plaintiffs are simply insufficient to form a basis for summary judgment in the plaintiffs' favor. The defendants move for summary judgment on the theory that the plaintiffs have failed to overcome the presumption that the statutory scheme permitting civil unions for same sex couples and marriages for opposite sex couples is constitutional.

## VI

## THE ANALYSIS OF HARM TO THE PLAINTIFFS

Were this case in its earlier posture, that is, before the passage of P.A. 05-10, this court would be obligated to undertake a constitutional analysis that is well settled in law. As the United States Supreme Court did in *Loving* v. *Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967), the court would look to the fundamental rights at issue and to the classifications involved and determine on what if any basis such rights had been denied to the plaintiffs. Under either a due process or an equal protection analysis, the court would then be required to measure the state's rationale for the discriminatory treatment of the plaintiffs by the appropriate standard of review.[6] The answer would then emerge: the harm suffered by the plaintiffs because of the state's conduct either would or would not pass constitutional muster.

But what if the plaintiffs suffered no actionable harm? What if the effects of the classification by the state were inconsequential from a legal perspective? What if the effects of the classification were, quite literally, nominal?

Connecticut law is clear that it is only after it has been shown as a threshold matter that the statutory

---

[6] In Connecticut, discrimination on the basis of physical sexual characteristics has been subjected to an intermediate standard of review. *Dydyn* v. *Dept. of Liquor Control*, 12 Conn. App. 455, 464, 531 A.2d 170, cert. denied, 205 Conn. 812, 532 A.2d 586 (1987), cert. denied, 485 U.S. 977, 108 S. Ct. 1272, 99 L. Ed. 2d 483 (1988). Discrimination against homosexuals has been subjected to rational basis review. *State* v. *John M.*, 94 Conn. App. 667, 684, 894 A.2d 376, cert. granted on other grounds, 278 Conn. 916, 899 A.2d 622 (2006); but see *Daly* v. *DelPonte*, 225 Conn. 499, 514, 624 A.2d 876 (1993) (discrimination against classes of persons mentioned in article first, § 20, of Connecticut constitution subject to strict scrutiny); accord R. Berdon, "Connecticut Equal Protection Clause: Requirement of Strict Scrutiny When Classifications Are Based Upon Sex, Physical Disability or Mental Disability," 64 Conn. B.J. 386 (1990).

scheme, on its face or as applied, treats similarly situated individuals differently that the court will consider whether such differential treatment is constitutionally valid. *State* v. *Angel C.*, 245 Conn. 93, 126, 715 A.2d 652 (1998). With this principle in mind, the court must examine the ways in which the treatment of the plaintiffs differs from that of similarly situated opposite sex couples under the law of Connecticut.

The effect of P.A. 05-10 has been to create an identical set of legal rights in Connecticut for same sex couples and opposite sex couples.[7] In their papers in support of summary judgment, the plaintiffs, who are now entitled to have their unions legalized, have been unable to identify any right or benefit conferred by the state that is different for them than for opposite sex couples whose unions are legalized. In fact, in scrutinizing the language of the new legislation, it is likely that any such difference that *could* be identified would be unlawful under the act.

Under the new statutory scheme, for example, plaintiffs Peck and Conklin are now allowed to unite in a civil union if they so desire. By doing so, they will no longer be subject to any of the legal disabilities—denial of hospital visitation, discrimination in the extension of credit, discrimination regarding dependency status on health insurance policies and discrimination regarding "points" to inherit UConn basketball tickets—that they formerly faced under state law.

---

[7] The plaintiffs argue that this case is about the fundamental rights of homosexuals, as opposed to heterosexuals, and no doubt the formation of same sex unions is much more likely among persons for whom romantic, sexual attraction to the same sex is a given. But it is also true that just as one need not be heterosexual to be a spouse in a traditional marriage, one need not be homosexual to be a spouse in a civil union. It may be that some compatible adults, especially older people, whatever their sexual disposition, choose to order their financial, household and testamentary affairs through state recognized civil unions.

The plaintiffs maintain, however, that they will still be subject to substantial impairment in the exercise of their civil rights on account of the rather less tangible effects of the status of civil unions. They claim (1) that the right to marry is fundamental under our law; (2) that the statutory scheme has created the lesser status of civil union, distinct from the more privileged status of marriage; (3) that the statutory scheme is a form of "separate but equal" segregation; (4) that the unfamiliarity of civil unions in common social or legal currency means that the plaintiffs must constantly explain their legal status to others; and (5) that their civil unions, unlike marriages, lack portability to other jurisdictions. None of these rises to the level of legal harm required to declare judgment in their favor.

## A

### "Marriage" as a Fundamental Right

The plaintiffs argue that marriage is a fundamental right and that to exclude the plaintiffs from it is a constitutional violation. Indeed, the right to marry has long been held to involve a fundamental liberty interest. *Turner* v. *Safley*, 482 U.S. 78, 95, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987); *Zablocki* v. *Redhail*, 434 U.S. 374, 384, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978); *Loving* v. *Virginia*, supra, 388 U.S. 12; *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923).

Using the language of these cases, the plaintiffs argue that marriage is unique compared to any other state approved relationship. They argue that marriage "is a unique legal and cultural status" that is the foundation "for a vast architecture of rights, benefits and obligations that protect couples and their children." They further argue that it is a social institution, and, though they do not argue this point, it is perhaps best known as an ecclesiastical institution.

As the plaintiffs themselves acknowledge, the precise structure of marriage has consistently undergone evolution. Rights that were once conferred only through a lawful marriage, such as the right to engage in sexual relations or the right of children to inherit property, are now virtually taken for granted outside of that institution. Being married no longer carries the cultural or social weight, for good or ill, that it did in decades past. Rather, in order to gauge the rights and benefits to which the plaintiffs claim entitlement, it is to the legal aspects of marriage that the court must look.

Until now, there has been no equivalent institution that conveys to its participants the rights, benefits and responsibilities of marriage. And it is surely these underlying rights, benefits and responsibilities with which substantive constitutional law is concerned, rather than with the nomenclature that is used to define those rights. For purposes of the constitution, it is only the legal aspects of marriage that are of consequence.

The plaintiffs nonetheless argue that because of the historic and continuing cultural significance of marriage to most people, this court must recognize their right to be admitted to that institution, and that institution alone.

Nostalgia for past traditions ought not be an impediment to the current acknowledgement of basic civil rights. Rather, it is to the substantive civil rights due them under the Connecticut constitution—those of personal fulfillment and legal security—that the plaintiffs are entitled, irrespective of how such rights have been denominated in the past. The fact that the rights conferred under P.A. 05-10 have previously been exclusively conferred through—and referred to as—marriage, provides no basis on which to find that the ameliorative statutory scheme in the recent legislation is unconstitutional.

## B

### Civil Union as a Lesser Status

The plaintiffs argue that the creation of the civil union for same sex couples, while retaining the status of marriage for opposite sex couples, has the effect of creating for them a legal institution of lesser status. The plaintiffs claim that the fact that marriage has heretofore been normative means that the creation of the separate term "civil union" must indicate the latter to be nonnormative and, thus, less privileged under the law. While that is an interesting philosophical point, it does not follow that such is the case from the standpoint of statutory construction.

Prior to the enactment of P.A. 05-10, opposite sex marriage was the only institution that conferred on its participants the comprehensive package of rights and benefits to which the plaintiffs are now entitled. With that enactment, the statutes of Connecticut cannot any longer be reasonably read to prefer one status over the other.[8] Indeed, the broad sweep of the statute indicates a legislative intent to confer not only *equal* but *identical* rights on same sex couples. Though the plaintiffs may feel themselves to be relegated to a second class status, there is nothing in the text of the Connecticut statutes that can be read to place the plaintiffs there.

The plaintiffs point out that the language of P.A. 05-10, § 14, defines the rights of civil union couples by

---

[8] General Statutes § 45a-727a (4), enacted in P.A. 00-228, § 1, expressly to permit same sex couples to become adoptive and foster parents, provides: "It is further found that the current public policy of the state of Connecticut is now limited to a marriage between a man and a woman." That statute, by its own use of the terms "*current* public policy" and "*now*" (meaning in 2000) is consigned to the pre-2005 era. Moreover, it appears to express only the policy regarding the *definition* of marriage. Its companion statute, General Statutes § 45a-727b, makes clear that no such language "shall be construed to establish or constitute an endorsement of *any* public policy with respect to marriage, civil union or any other form of relation" between those who coparent children. (Emphasis added.)

reference to the rights of married couples—same sex spouses "shall have all the same benefits, protections and responsibilities under law . . . as are granted to spouses in a marriage . . . ." They argue that this construction, subsuming the newly created group into the existing group, is an implicit decree that marriage is the superior and more privileged status. The court finds, however, that this construction is merely indicative of the difficulty of making certain that the new law is indeed applied equally to both groups without exception.

This definitional construct is hardly unknown in our law. For example, at an earlier point in our history, all laws were cast in the masculine gender. Though the largely administrative task of eliminating from our legal grammar this traditional (and some would say demeaning) use of the masculine as norm is ongoing, that task is furthered by a general provision in our General Statutes that defines the masculine to include the feminine gender. See General Statutes § 1-1 (g). Our criminal statutes, despite relatively recent (1969) and ongoing revisions, are still nearly uniformly couched in the masculine gender, using "he" and "him" as the pronouns of choice throughout. See General Statutes §§ 53a-1 through 53a-323. No one can seriously argue that the language of these statutes is evidence any longer of some public policy of preferring males over females under Connecticut law. Indeed, the Connecticut constitution itself, article first, § 1, reads in relevant part: "All *men* . . . are equal in rights . . . ." (Emphasis added.) While one may yet feel a pang at the historical injustice presented by this phrase, it is of no *legal* significance. Notwithstanding the use of the traditional term marriage to assist in defining the less traditional civil union, no harm of constitutional magnitude can be inferred by such usage.

The plaintiffs further argue that the term civil union is offensive and demeaning to them. First, there is nothing inherently insulting about the term "civil union." Neutral and of relatively recent origin, it has no history as an insult or slur, and it is properly descriptive of the type of legal institution to which it applies.

Second, offensiveness is largely in the eye of the beholder. It is apparent from the briefs of some of the amici curiae in this case that they would be offended if the term marriage were applied to the plaintiffs. As Justice Harlan observed, "[O]ne man's vulgarity is another's lyric." *Cohen* v. *California,* 403 U.S. 15, 25, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971). The court declines to use such a subjective criterion as a basis on which determine the constitutionality or unconstitutionality of a statutory scheme.

Third, in general, the law, particularly constitutional law, does not protect one from being offended, nor does it afford relief for one who takes offense. Particularly in a pluralistic democracy, such a claim of harm does not implicate legal rights or rise to constitutional dimensions. For example, in *Paul* v. *Davis,* 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976), the United States Supreme Court considered whether a sense of being outcast or a sense of being held in disrepute or subject to a stigma on account of government action was a cognizable harm under the due process clause. The court held that such a sense of injury, even though genuinely felt, did not involve a liberty or property interest under the constitution.

Where the rights or benefits to which the plaintiffs are entitled by law are not affected by the names given to the package of rights and benefits, constitutional principles are not implicated. Also, courts are particularly ill equipped to deal with the mutability of language,

divorced from behavior or conduct. That which is offensive evolves, and a court decree is immutable, making the naming of legal matters an area particularly suited to legislative rather than judicial policymaking.[9]

## C

### Civil Union as a "Separate but Equal" Status

The plaintiffs claim that the use of two different terms—marriage and civil union—is a form of separation or segregation that is unconstitutional regardless of whether the state treats the two unions differently. They urge the court to find that this difference in nomenclature, without further proof of any differing treatment, is worthy of a comprehensive constitutional analysis under the equal protection and due process clauses of the state constitution. This court has been unable to find any case in which the mere difference in nomenclature applied to two groups merits such an analysis.

In general, equal protection means that the state must treat alike all persons similarly situated. *State* v. *Campbell*, 224 Conn. 168, 185, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993); see also *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). The cases in this area all involve an analysis of whether the government can justify treating one class of persons differently from another. The system of classification must work to the actual disadvantage of one class in some material way. Although the cases focus on whether the "classification" is unlawful, that is so because the unequal and disadvantageous treatment is usually not in controversy; rather, it is the government's

---

[9] For example, the word "bastard" was once a customary legal term, but it came to be considered pejorative, and the legislature abolished its use in the statutes, substituting less disparaging language. Compare General Statutes (Cum. Sup. 1963) § 52-435 with Public Acts 1965, No. 406, now codified generally as General Statutes § 46b-160 et seq.

justification for such treatment that is the subject of the lawsuit.

"The Equal Protection Clause does not forbid classifications. It simply keeps decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger* v. *Hahn,* 505 U.S. 1, 10, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992). Put another way, the fact that two similar groups—men and women, say—are referred to by two different names does not provide the basis for an equal protection or due process challenge.

In *Morales* v. *Daley,* 116 F. Sup. 2d 801 (S.D. Tex. 2000), aff'd sub nom. *Morales* v. *Evans,* 275 F.3d 45 (5th Cir. 2001), cert. denied, 534 U.S. 1135, 122 S. Ct. 1079, 151 L. Ed. 2d 980 (2002), the federal District Court addressed a challenge to the government's use of a census form that required individuals to classify themselves by race and ethnicity, as well as by legitimacy and other categories. The plaintiffs in *Morales* argued that the government's mere classification of persons by race and ethnicity was a harm, especially given the historic misuse of such data to perpetuate invidious discrimination. The court disagreed and declined to undertake an equal protection or due process analysis. Rather, the court held that such classifications, divorced from any discriminatory use of the data, are not unconstitutional.

The plaintiffs here argue that this is more than a mere difference in nomenclature—that it denotes a separation, akin to the "separate but equal" justification advanced by the defendants in *Brown* v. *Board of Education,* 347 U.S. 483, 493–95, 74 S. Ct. 686, 98 L. Ed. 873 (1954). In its cases repudiating the doctrine of "separate but equal," however, the United States Supreme Court was confronted with separate facilities or actual *physical* separation. In *Brown* and in *Sweatt* v. *Painter,* 339 U.S. 629, 70 S. Ct. 848, 94 L. Ed. 1114 (1950), blacks

were forbidden to attend certain schools designated as white only. In *McLaurin* v. *Oklahoma State Regents*, 339 U.S. 637, 640, 70 S. Ct. 851, 94 L. Ed. 1149 (1950), the petitioner, who was black, was admitted to the state's formerly white only graduate school but was compelled to sit in a "colored only" row in the classroom, a "colored only" table in the library and a "colored only" table for meals in the cafeteria. Notably in *McLaurin*, the state of Oklahoma argued that the restrictions placed on the petitioner were "nominal"; id.; in that there was no bar to his attending the same classes, using the same library and eating in the same cafeteria as white students. But the court found that the separation to which he was subjected constituted a real injury because the physical segregation from his fellow students caused an impairment of his ability "to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession." Id., 641.

More recently, the Supreme Court reiterated this view in *United States* v. *Virginia*, 518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) (VMI case), the case that struck down the exclusion of women from admission to the Virginia Military Institute (VMI). Citing *Sweatt* v. *Painter*, supra, 339 U.S. 633, the court focused again on whether the proposal to create a separate institution for women, called the Virginia Women's Institute for Leadership (VWIL) with a campus separate from VMI, violated the rights of the women cadets. Without discounting the intangible prestige[10] of matriculating at VMI, the court's decision was controlled by the measurable factors that made the VWIL program less prestigious: the faculty of VWIL was less impressively credentialed and less well paid, the course offerings were more limited, and there were fewer opportunities for military training and scientific specialization. *United*

---

[10] See part V B of this memorandum of decision.

*States* v. *Virginia,* supra, 557. Regardless of how the participants or the public *felt* about the relative prestige of the competing institutions, the separation in the *Brown, Sweatt, McLaurin* and *VMI* cases was tangible and observable, and the harm, though intangible, derived from the act of physical separation.

The plaintiffs before this court are subject to no such barriers. Though they argue that separate is never equal, they have been subjected to no tangible separation at all, and the court rejects the argument that the *rhetorical* separation of marriage vs. civil union is enough to invoke an equal protection or due process analysis.

D

The Lack of "Civil Union" in Common Parlance

One of the sources of injury claimed by the plaintiffs is that under the current statutory scheme, the term "civil union," as opposed to "marriage," has a lack of general recognition or acceptance in common parlance. The plaintiffs fear that they may have to explain themselves or their relationship and may have to define it or prove it when they attempt to exercise their legal rights. This is highly speculative given the overwhelming—and almost daily—publicity that currently surrounds the issue of committed same sex relationships. If the necessity to explain the relationship does occur for a time, it will occur whether the plaintiff couples unite in a civil union or unite in a marriage, since however named, the public registration of same sex relationships is one that has only been recently adopted.[11]

---

[11] There is, of course, nothing that prevents the plaintiff couples from referring to one another as "spouse" or "husband" or "wife" as they choose, nor is there apparently anything unlawful about referring to the civil union as a marriage for purposes of everyday conversation, and such a reference would be particularly apt for those couples who, like the Levine-Rittermans, have had a religious wedding.

Even if the title, nature or benefits of a civil union must be explained or defined by the plaintiffs to others with whom they interact, that fact does not amount to legal harm. Nor is it the type of harm for which the remedy is a clarification of the law (the law is, after all, clear) or a change in the title on their license. Rather, the remedy rests in the education of or sanction against persons who may attempt to deny the couple the rights and benefits of the law. Chief Justice Vinson, in the *McLaurin* case, acknowledged the difficulty in promoting tolerance through the mere action of government. Ending segregation "will not necessarily abate individual and group predilections, prejudices and choices." *McLaurin* v. *Oklahoma State Regents*, supra, 339 U.S. 641. What the petitioner in *McLaurin* could achieve, however, was "the opportunity to secure acceptance . . . on his own merits." Id., 641–42; see also *Palmore* v. *Sidoti*, 466 U.S. 429, 433, 104 S. Ct. 1879, 80 L. Ed. 2d 421 (1984).

The fact that some may be ignorant of the law or intolerant of the plaintiffs does not compel this court to declare the statutory scheme unconstitutional.

E

The Lack of "Portability" of the Civil Union

This, alas, is a real injury. The lack of legal recognition of same sex civil unions in most other states, and the looming inequity embodied in the federal Defense of Marriage Act, 1 U.S.C. § 7, create a host of ills and uncertainty for the plaintiffs in their attempt to avail themselves of federal and interstate rights and benefits. But this is not caused by the nomenclature used in the Connecticut legislation. Rather, this is caused by the continuing refusal of most other jurisdictions to enact legislation that recognizes the basic civil rights so recently and comprehensively recognized by the General Assembly in P.A. 05-10. Called marriages or called

civil unions, the plaintiffs are threatened by the same harm in jurisdictions outside Connecticut, a situation over which neither the legislature nor this court has any power.

## VII

## THE ROLE OF THE COURT

Our executive, legislative and judicial branches share the responsibility of upholding the Connecticut constitution. When the General Assembly passes legislation and the governor signs it into law, they are stating, in effect, that they believe the legislation is constitutional. *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 422, 891 A.2d 959 (2006). Thus, legislative enactments carry with them a strong presumption of constitutionality, and a party challenging the constitutionality of a validly enacted statutory scheme bears a heavy burden of proving unconstitutionality beyond a reasonable doubt. *Zapata* v. *Burns*, 207 Conn. 496, 507–508, 542 A.2d 700 (1988). A corollary of this principle is the rule that a plaintiff may not successfully attack the constitutionality of legislation unless the legislation adversely affects the plaintiff's constitutionally protected rights. *Hardware Mutual Casualty Co.* v. *Premo*, 153 Conn. 465, 470–71, 217 A.2d 698 (1966).

The role of the court is to tread carefully in this area. It is the legislature that is the arbiter of public policy. *Lyman* v. *Adorno*, 133 Conn. 511, 514, 52 A.2d 702 (1947). The court must be mindful that the judicial branch has very limited authority to interfere with the determination by the General Assembly as to those provisions of law that are intended to further the welfare of the citizens of Connecticut. Id.

On the other hand, it is the duty of the court to declare unconstitutional any statute or statutory scheme that clearly infringes on the fundamental rights to equal

protection and due process of law when a challenge is mounted by plaintiffs who suffer actual harm thereby. See *Sheff* v. *O'Neill*, 238 Conn. 1, 13, 678 A.2d 1267 (1996). In such a case, the court ought not to be dissuaded from its duty by deferring to the legislature's use of unprovable stereotypes in the guise of a "rational basis" for the legislation.

However, it would be the elevation of form over substance to hold unconstitutional Connecticut's current statutory scheme based on the challenge of these plaintiffs, who are entitled to the identical rights and identical treatment as opposite sex married persons in Connecticut.

## VIII

## CONCLUSION

Civil union and marriage in Connecticut now share the same benefits, protections and responsibilities under law. The Connecticut constitution requires that there be equal protection and due process of law, not that there be equivalent nomenclature for such protection and process.

The motion for summary judgment of the plaintiffs is denied. The motion for summary judgment of the defendants is granted.